Transcript of the Testimony of

# Robert W. Avery

**Date:** March 8, 2019

**Case:** Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

## Bushman Court Reporting

Tiffanie Harrison
Phone:  (501) 372-5115
Fax: (501) 378-0077
<www.bushmanreporting.com>



EXHIBIT
1

IN THE UNITED STATES DISTRICT COURT
WESTER DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


ROBERT W. AVERY                                    PLAINTIFF


VS.                    NO. 5:18-cv-05075-PKH-ELW


TURN KEY HEALTH CLINICS, LLC;
TRINITY SERVICES GROUP, INC.;
SHERIFF HOLLOWAY, CAPTAIN GUYLL;
LIEUTENANT HOLT; KEEFE COMMISSARY
NETWORK, LLC                                       DEFENDANTS



Oral Deposition

of

Robert Avery

(Taken March 8, 2019 at 11:15 a.m.)






TIFFANIE N. HARRISON, CCR

BUSHMAN COURT REPORTING

LITTLE ROCK, ARKANSAS 72203

(501) 372-5115

harrisonreporting@outlook.com

Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

Mr. Robert Avery
(PTF) Hawkins Unit for Men
P.O. Box 1010
Wrightsville, Arkansas 72183
      Pro Se

ON BEHALF OF THE DEFENDANTS:

Ms. JaNan Arnold Davis
Association of Arkansas Counties
1415 W. Third Street
Little Rock, Arkansas 72201
(501) 375-8805
jdavis@arcounties.org
      Representing Sheriff Holloway,
      Captain Guyll and Lieutenant Holt

Mr. Benjamin Jackson
Mitchell, Williams, Selig,
Gates & Woodyard, PLLC
425 West Capitol Avenue, Suite 1800
Little Rock, Arkansas 72201
(501) 688-8887
bjackson@mwlaw.com
      Representing Turn Key Health
      Clinics, LLC

Mr. Scott Wray
Hall Estill
75 North East Avenue, Suite 500
Fayetteville, Arkansas 72702
(479) 973-5200
swray@hallestill.com
      Representing Trinity Services Group, Inc.

Tiffanie N. Harrison, CCR

(501) 372-5115

Page 3

INDEX

STYLE AND NUMBER. . . . . . . . . . . . . . . . . . . . 1

APPEARANCES . . . . . . . . . . . . . . . . . . . . . . 2

CAPTION. . . . . . . . . . . . . . . . . . . . . . . . 4

PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . 5

    Examination by Ms. Davis. . . . . . . . . . . . . 5

    Examination by Mr. Jackson . . . . . . . . . . . 83

    Examination by Mr. Wray . . . . . . . . . . . . . 88

    Further Examination by Ms. Davis . . . . . . . . 118

PROCEEDINGS CONCLUDED. . . . . . . . . . . . . . . . 122

COURT REPORTER'S CERTIFICATE . . . . . . . . . . . . 123

EXHIBITS

None marked.

Tiffanie N. Harrison, CCR

(501) 372-5115

Page 4

1                            CAPTION

2        PROCEEDINGS in the above-styled and numbered cause

3   on the 8th day of March, 2019, before Tiffanie N.

4   Harrison, Arkansas Supreme Court Certified Court

5   Reporter #757, at 11:15 a.m., at the Arkansas Department

6   of Corrections, Hawkins Unit for Men, Wrightsville,

7   Arkansas, pursuant to the agreement hereinafter set

8   forth.

9

10                   *  *  *  *  *  *  *  *  *

11

12                         STIPULATIONS

13        IT IS STIPULATED AND AGREED by and between the

14   parties through their respective counsel that the oral

15   deposition of Robert Avery may be taken for any and all

16   purposes according to the Arkansas Rules of Civil

17   Procedure.

18

19                   *  *  *  *  *  *  *  *  *

20

21

22

23

24

25

                       Tiffanie N. Harrison, CCR
                           (501) 372-5115

Page 5

1                             PROCEEDINGS

2               (WHEREUPON, the oath was administered.)

3          THEREUPON,

4                      Robert Avery,

5                THE WITNESS HEREINBEFORE NAMED,

6               having been first duly cautioned and

7               sworn by me to testify to the truth,

8               the whole truth, and nothing but the

9               truth, testified on their oath as

10              follows, to-wit:

11                            EXAMINATION

12   BY MS. DAVIS:

13   Q    Good morning, Mr. Avery.  I know you know who I am,

14   and you know the drill, but just for the record, we're

15   going to go ahead and do it on the record.  My name is

16   JaNan Davis.  I represent Sheriff Holloway, Captain

17   Guyll, and Lieutenant Holt, the Benton County defendants

18   that you have sued in case number 18-5075.

19        The court has given us permission to take your

20   deposition today, so that's what we're here to do.

21   We're not here to ask you any legal questions, just

22   factual questions.  I'm not here to confuse you.  Again,

23   as you know, I will give the Court the entire transcript

24   of the deposition.  Not pieces of it; the whole thing.

25   So I'm not trying to ask you any trick questions, and

                    Tiffanie N. Harrison, CCR
                        (501) 372-5115

Page 6

1   will provide your entire answer.

2        As you know, neither I, nor the other two attorneys

3   here, represent you, so this is not confidential.  Your

4   testimony will be given -- it will be public

5   information.  It is given to the Court completely, in a

6   written transcript form.  So I want to make sure that

7   it's clear, that you don't believe that any of the three

8   of us represent you; is that correct?

9   A    Yes, ma'am, I know.

10  Q    And you also know that in a deposition, the court

11  reporter can only take down the words that we say, so if

12  you make -- use your hands, or your head, to answer the

13  question, either by a nod or a shake, or perhaps showing

14  your hands, in terms of distance or something, I may ask

15  you to clarify that.  It's not to be rude.  It's just to

16  make sure that it's clear on the record.

17       Are you taking any medications that interfere with

18  your ability to give testimony today?

19  A    No, ma'am.

20  Q    Again, as you know, I will ask you some background

21  questions about your family, your history, that sort of

22  thing, your employers.  I don't intend to contact those

23  people, unless you tell me they have evidence that's

24  relevant to this case, okay?

25  A    Yes, ma'am.

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 7

1   Q    Okay.  And I will do a little it of background.

2   And I think as we go forward, what I believe we will try

3   to do is, I'm going to ask you your questions that --

4   sort of the introductory background type questions, and

5   then ask you questions relating to my clients, your

6   claims against my clients.  Then, each of the other

7   attorneys will also have an opportunity to ask you

8   questions related to your claims against their clients,

9   okay?

10  A    Yes, ma'am.

11  Q    All right.  So give me your full name, and date of

12  birth.

13  A    Robert William Avery, 2-18-72.

14  Q    And where were you born?

15  A    Tulsa, Oklahoma.

16  A    When did you move to Arkansas?

17  A    '98, approximately.

18  Q    And where was it that you moved to?

19  A    Siloam Springs.

20  Q    Have you lived in that area since that time?

21  A    I went back in 2006-2007.

22  Q    Okay.  Back to Oklahoma?

23  A    No, ma'am, that was Siloam Springs, Arkansas.

24  Q    All right.  Have you been in Arkansas, since 1998?

25  A    Yes, ma'am.

Page 8

```
 1   Q    Your last address, as I recall, was in Springdale;
 2   is that right?
 3   A    Yes, ma'am.
 4   Q    And who did you live with there?
 5   A    My wife, Mary.
 6   Q    What's her last name?
 7   A    Her maiden name is Johnston.
 8   Q    When were you married to Mary Johnston?
 9   A    2014 to '16.
10   Q    And you were granted a divorce?
11   A    Yes, ma'am.
12   Q    When was that?
13   A    '16.
14   Q    Do you recall the approximate date?
15   A    October 5th.
16   Q    October of '16?
17   A    Yes, ma'am.
18   Q    And that was in Washington County?
19   A    Washington County, yes, ma'am.
20   Q    Was that after you were arrested?
21   A    Yes, ma'am.
22   Q    So you were in custody during that process of that
23   divorce?
24   A    Yes, ma'am.
25   Q    At the time of your arrest, which preceded the
```

Tiffanie N. Harrison, CCR
(501) 372-5115

```
                                                      Page 9
 1   incarceration at Benton County, that's at issue in this

 2   case, where were you living?

 3   A    In Gentry, Arkansas.

 4   Q    And when approximately would that have been?

 5   A    That would've been from like December of 2017 until

 6   March 12, 2018.

 7   Q    And with whom were you living there?

 8   A    I was renting a trailer from -- what's her name?

 9   All I know her by is Ms. Woods.

10   Q    Okay.  Were you living alone there?

11   A    Yes, ma'am.

12   Q    And you were arrested on March 12, 2018 for what?

13   A    Aggravated assault.  No, excuse me.  It was

14   domestic battery of the second degree.

15   Q    Who was the alleged victim in the case?

16   A    Jamie DiFrancisco.

17   Q    Can you spell her last name?

18   A    D-I-F-R-A-N-C-I-S-C-O.

19   Q    And what is your relationship to her?

20   A    Just casual.  Not really boyfriend and girlfriend.

21   Q    Well, you were charged with domestic battery, so I

22   assume there was a domestic relationship.

23   A    Yes, ma'am.

24   Q    What was that domestic relationship?  Were you

25   living together?
```

Page 10

1  A    No, ma'am, we weren't living together.  We weren't

2  boyfriend and girlfriend.  It's complicated, so put down

3  boyfriend and girlfriend, if you like.

4  Q    You had a romantic relationship with her?

5  A    Sexual relationship.

6  Q    What was the outcome of that charge?

7  A    I took 15 years in a plea bargain.

8  Q    You pled guilty to domestic battery second?

9  A    Yes, ma'am.

10 Q    When was that?

11 A    July 30th of 2018.

12 Q    And you were sentenced to 15 years?

13 A    Yes, ma'am.

14 Q    Was that any suspended?

15 A    An additional 10 suspended.

16 Q    15 years time, plus 10 suspended?

17 A    Yes, ma'am.

18 Q    Were you sentenced as an habitual offender?

19 A    Yes, ma'am.

20 Q    Was there a no contact order issued when you were

21 arrested?

22 A    Yes, ma'am.

23 Q    What did you understand the terms of that no

24 contact order to be?

25 A    No contact with Jamie DiFrancisco until the judge

Page 11

1    lifted it.

2    Q    Do you have a continuing relationship with this

3    person?

4    A    No.  I'm still under court order.

5    Q    So the no contact order still exists?

6    A    Yes, ma'am.

7    Q    All right.  Let me back up a little bit.  Where did

8    you go to high school?

9    A    Hobart High School, Hobart Oklahoma.

10   Q    Did you graduate?

11   A    No, ma'am.

12   Q    What was the last year of school that you attended?

13   The last grade?

14   A    1989.

15   Q    1989, which would have been?

16   A    My sophomore year.

17   Q    10th grade.  And what was it that led you to not

18   return to school in the 10th grade?

19   A    No, excuse me.  I mean my junior year.  Sorry.

20   Q    That's okay.  What was it that led you to leave

21   after your --

22   A    My junior year?

23   Q    Uh-huh.

24   A    I decided to go to work.  I had worked all that

25   summer, and I thought that's what I should do.

Page 12

1   Q     Did you get a GED?

2   A     Yes, ma'am.

3   Q     When did you get that?

4   A     1994.

5   Q     Where did you get that?

6   A     In Independence Kansas at the Adult Development

7   Center.

8   Q     What is the Adult Development Center?

9   A     It's a place for adults to go get their GED post

10  school.

11  Q     Okay.  So it's a community center of sorts?

12  A     Yes, ma'am.

13  Q     And do you have any additional training, or

14  education?  Any college classes?

15  A     I've taken college classes through the Arkansas

16  State University.

17  Q     You've done that while incarcerated?

18  A     Yes, ma'am.

19  Q     Do you have any certificates, or any degrees, or

20  anything else?

21  A     No, ma'am.  I haven't finished.

22  Q     When was the first time that you were -- or do you

23  recall, the first time you were in custody at the Benton

24  County Detention Center?

25  A     First time ever?

Page 13

1    Q    Yes, Sir.

2    A    I don't recall.  The first serious trouble I've

3    been in, I can remember that clearly.  That was in 2007.

4    Q    Okay.  Was that in Benton County?

5    A    Yes, ma'am.

6    Q    Okay.  What was that?

7    A    Manufacturing methamphetamine.

8    Q    How long did you spend in Benton County Detention

9    Center then?

10   A    Until August sometime, of 2007.  From January 16,

11   2007, until August of 2007, August 23rd, I believe.

12   Q    And is that because you were released, or you were

13   sent to ABC on the sentence?

14   A    I was sent to ADC.

15   Q    How many times would you estimate you've been back

16   in Benton County, since that time?

17   A    Five times, at least.

18   Q    When were you last employed?

19   A    2013.

20   Q    How were you employed?

21   A    How was I employed?

22   Q    Yes.  What job?

23   A    As a painter.  Painter doing industrial remodels.

24   Q    Who were you employed through?

25   A    Chris Walker, from Walkers Builders.

Page 14

1    Q    Where is that?

2    A    His office is located in Elm Springs.

3    Q    How long did you work for him as a painter?

4    A    A year.

5    Q    Did you have any training or anything as a painter

6    before that, or was it just something that you were able

7    to learn on the job?

8    A    I come from a family of painters.

9    Q    All right.  So since that time -- you have not

10    employed since 2014?

11    A    No, ma'am.

12    Q    Do you draw disability at all?

13    A    No, ma'am.  I've been incarcerated that whole time.

14    Q    Okay.  You identified the day that your marriage to

15    Mary Johnston in 2014.  Were you incarcerated when you

16    married her?

17    A    Yes, ma'am, at the Grimes Unit.

18    Q    And so the first time that you actually -- did you

19    ever actually cohabitate with Ms. Johnston?

20    A    Yes, ma'am.  I was released in 2015 for a short

21    period of time.

22    Q    All right.  So you lived with her then.  Did you

23    work at all during that period of time?  2015, when you

24    were released?

25    A    No, ma'am.  I wasn't out that long.

Tiffanie N. Harrison, CCR

(501) 372-5115

Page 15

1    Q     Have you ever claimed damages or injuries from an

2    accident or other insurance policy?  Anything of that

3    nature?

4    A     No, ma'am.

5    Q     Tell me about your ongoing medical issues, kind of

6    chronic medical issues.

7    A     Varicose veins, blood pooling in my legs.

8    Q     When were you first diagnosed with varicose veins?

9    A     2012, I believe.

10   Q     Where was that?

11   A     Arkansas Department of Corrections.

12   Q     And what treatment, if any, do you receive for

13   that?

14   A     Compression stockings.

15   Q     Anything else?

16   A     A four hour duty script.

17   Q     And by that, tell me what that means.

18   A     Restricts you from any prolonged standing, walking,

19   stooping, crawling.  Because they said anything longer,

20   causes the leg to engorge and blood to pool.

21   Q     Do you have a job here at ADC?

22   A     No, ma'am.  I'm in PTF, more or less.  I have a 45

23   minute to an hour job that I do once or twice a week.

24   Q     Okay.  What is that?  Kitchen worker, cleaning

25   vents.

Page 16

1    Q    Once a week?

2    A    Yes, ma'am.

3    Q    When you say PTF, what do you mean?  What does that

4    stand for?

5    A    It's a Pathway to Freedom Program.

6    Q    Is that an early parole type of --

7    A    No, ma'am.  It's a spiritually, Christ-based,

8    recovery, rehabilitation program, that's voluntary.

9    It's 18 months long.  Deals with drug addictions,

10   relationship issues, so on and so forth.

11   Q    Does that have any impact on your release?

12   A    Not that I know of.

13   Q    All right.  So in that program, what drug issues,

14   or alcohol issues are you dealing with?

15   A    Just my alcoholism.

16   Q    All right.  You described your varicose veins.  Any

17   other medical issues?

18   A    Just PTSD.

19   Q    And what is your PTSD from?

20   A    Just being locked up, that's what the psychiatrist

21   said.

22   Q    Any particular event, or just generally?

23   A    There's numerous.

24   Q    There's numerous what?

25   A    Numerous events, stabbings, and all.

Page 17

1    Q    When were you diagnosed?

2    A    I started receiving medication for it in 2016.

3    Q    Was that the first diagnosis?

4    A    Yes, ma'am.

5    Q    And what's the medication that you receive for

6    that?

7    A    I started out with citalopram.  The symptoms

8    progressively got worse.  In 2018 the psychiatrist

9    decided to give me -- take me off the citalopram and put

10    me on Abilify.  The Abilify wasn't strong enough, or

11    doing enough, because my PTSD, anxiety and depression

12    kept getting -- progressively got worse, so he put me on

13    Depakote as well.

14    Q    Abilify and Depakote?

15    A    Yes, ma'am.

16    Q    And that's since you've been here?

17    A    No, ma'am.  That began in Benton County, whenever

18    he adjusted my medication.

19    Q    So in addition to PTSD, you identified anxiety, and

20    depression?

21    A    Yes, ma'am.

22    Q    When were you diagnosed with those?

23    A    2018.

24    Q    In Benton County?

25    A    In Benton County.

Page 18

1    Q    If you experience different symptoms, because of

2    each diagnosis, I'd like for you to describe the

3    symptoms, and tell me which diagnosis those refer to.

4    If it's the same, then you can describe them

5    collectively.  But, what symptoms do you experience, as

6    a result of these mental health diagnosis?

7    A    Hypervigilant.

8    Q    By that, what do you mean?

9    A    Advanced paranoia, hypervigilance.  Advanced

10   paranoia, feeling as if everyone is out to get me.

11   Q    If you can, avoid giving me sort of medical terms.

12   I'm asking you what you experience.  So like how you

13   would describe to someone who doesn't know what that

14   medical term means, okay?

15   A    Yes, ma'am.

16   Q    So you think everyone is out to get you?

17   A    Yes, ma'am.

18   Q    And how does that affect you?

19   A    It causes me to want to withdraw, go back into

20   myself, or to become withdrawn.  Yeah, that's it.

21   Q    So it causes you not to want to have contact with

22   other people?

23   A    It makes it extremely difficult to have contact

24   with other people.

25   Q    What about it is difficult?  I mean, how do you

Page 19

1    experience that?

2    A     Just the interaction is difficult.

3    Q     Does it interfere with your ability to eat?

4    A     No, ma'am.

5    Q     Does it interfere with your ability to sleep?

6    A     It does with the sleep.

7    Q     How so?

8    A     Because it makes me remain awake with paranoid

9    feelings.

10   Q     And does the Abilify and Depakote resolve that?

11   A     It takes the edge off, yes, ma'am.

12   Q     So it doesn't resolve it; it just makes it better?

13   A     Makes it bearable, yes, ma'am.

14   Q     Any other symptoms?

15   A     Like whenever I'm in real crowded spots, real loud,

16   it puts me on edge, makes me want to further withdraw or

17   become combative.

18   Q     Have you had instances where that occurred?  Were

19   you became combative?

20   A     Yes, ma'am.

21   Q     Where is that?

22   A     In Benton County.

23   Q     When?

24   A     2018.  I don't know the exact date.

25   Q     Can you describe the event for me, a little bit?

Page 20

1   A    I told everybody to get away from me, or else, kind

2   of ultimatum style.

3   Q    So you didn't actually get into a fight with

4   someone?

5   A    No, ma'am.

6   Q    You just told everyone, like the other people in

7   your cell -- I mean, your pod?

8   A    Yes, ma'am.

9   Q    Anything else?

10  A    No.

11  Q    So those are all the symptoms?

12  A    I believe so.

13  Q    All right.  Any other medical, or mental health

14  issues, that you deal with on an ongoing basis?

15  A    No, ma'am.

16  Q    So that I've got the timeline correct, were you in

17  custody, and you were arrested on a warrant out of

18  Benton County, or were you actually arrested by Benton

19  County?

20  A    I was arrested by Benton County in Siloam Springs.

21  Q    And that was on March 12th?

22  A    Yes, ma'am.

23  Q    And you were arrested on -- let's see --

24  A    Second-degree domestic battery and a parole

25  violation.

Page 21

1  Q    Was there also a third-degree domestic battery?

2  A    Yes, misdemeanor.

3  Q    And terroristic threatening?

4  A    Yes.

5  Q    Endangering the welfare of a minor?

6  A    (Non-verbal response.)

7  Q    Is that right?

8  A    Yes, I was arrested for it.

9  Q    Theft of property?

10 A    Yes.

11 Q    That was unrelated, correct?  That was a separate

12 warrant?

13 A    Yes.

14 Q    So when you were arrested, who did you identify as

15 your next of kin?

16 A    Probably Jamie, or Roy Avery.  I can't remember.

17 Q    Okay.  I'm going to show you what I have, and it

18 indicates to me, that you indicated Mary Johnston.  I'm

19 showing you page number 12, out of your jail file, and

20 it shows Mary Johnston as your next of kin; is that

21 right?

22 A    Yeah.  They left everything the same, because when

23 they booked me in, I told them to leave everything like

24 it was, because I didn't know who to put on there.

25 That's why her old stuff is on there.

Page 22

1   Q    Okay.  And you didn't know who to put on there,

2   because you had been arrested actually, related to Jamie

3   DiFrancisco?  Is that her name?

4   A    Yeah, that's her name, but that's not the reason

5   why I left it like that.

6   Q    Tell me why you left it like that.

7   A    Because I didn't have Tracy Ellison's address.

8   Q    Who is Tracy Ellison?

9   A    My real girlfriend.

10  Q    And it just occurred to me, that I meant to ask you

11  some questions that I forgot to.  So you were married to

12  Mary Johnston, and you were divorced.  At the time of

13  your arrest, your girlfriend's name was Tracy Ellison?

14  A    Yes, ma'am.

15  Q    Yet you had a relationship with Jamie DiFrancisco?

16  A    Yeah.  It's complicated.

17  Q    Do you have any other family in Northwest Arkansas?

18  A    Yes, Roy Avery, my grandfather.

19  Q    Anyone else?

20  A    No, not that I know of, unless they moved here

21  recently.

22  Q    Do you have any siblings?

23  A    I have three half-brothers that live in Oklahoma.

24  Q    And your parents are both deceased; is that right?

25  A    I don't know my father.  My mother, we don't have

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

                                                                  Page 23

1    any contact.

2    Q    You don't believe she lives in Arkansas?

3    A    No.

4    Q    Do you have children?

5    A    Yes, I two daughters.

6    Q    Are either of them over 18?

7    A    Yes, Jessica is.

8    Q    And what's her last name?

9    A    Avery.

10   Q    And where does she live?

11   A    Somewhere in Tulsa.

12   Q    Okay.  So she's in Oklahoma, as well?

13   A    Yes, ma'am.

14   Q    And what is the name of -- does either Jessica's

15   mother, or the mother of any other children, live in

16   Arkansas that you're aware of?

17   A    Not that I'm aware of, no.

18   Q    Okay.  So you were arrested on these five charges,

19   and ultimately, you pled --

20   A    Pled guilty to three.

21   Q    You pled guilty to which three?

22   A    The first three you wrote down.

23   Q    Domestic battery third, domestic battery second,

24   and terroristic threatening?

25   A    Yes.

                        Tiffanie N. Harrison, CCR
                           (501) 372-5115

Robert W. Avery 3/8/2019                                          Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 24

1   Q    And when you came in, what medical issues did you

2   identify?

3   A    Abscessed tooth.

4   Q    When did your tooth become abscessed?

5   A    It was abscessed when I got there.

6   Q    Right.  So when did it start?

7   A    Just a few days before.

8   Q    What had you done for it?

9   A    Used Orajel and had called a dentist, and had an

10  appointment.

11  Q    What dentist?

12  A    One in Siloam; I don't know his name.  Jamie helped

13  me with it.

14  Q    So Jamie would be able to identify what dentist in

15  Siloam Springs?

16  A    I believe so.

17  Q    When was your appointment?

18  A    Friday, the 12th, 13th, 14th.  No, it would've been

19  on Wednesday the 13th, I believe.

20  Q    The next day?

21  A    Either the next day, or the following day, 13th or

22  14th.

23  Q    Anything else you identified on intake?

24  A    The varicose veins.

25  Q    Anything else?

Tiffanie N. Harrison, CCR
(501) 372-5115

Bushman Court Reporting                      Tiffanie Harrison                      501-372-5115

Page 25

1   A    I told them about a vegan diet, vegetarian.

2   Q    What did you tell them about a vegan diet,

3   vegetarian?

4   A    Seventh-day Adventist vegetarian.

5   Q    You told them that on intake?

6   A    Yes, ma'am.

7   Q    Tell me about that.  What do you mean that you were

8   a Seventh-day Adventist, and needed a vegetarian diet?

9   A    Yeah, that's all they wrote on their, when they

10  were doing the questionnaire.  They just put veggie,

11  soft tray from deal, amoxicillin and ibuprofen.

12  Q    Okay.  So you were taken amoxicillin?

13  A    No.  That was what they -- I guess that's what they

14  said I needed.

15  Q    So a soft tray because of your tooth?

16  A    Yes, ma'am, the abscess.

17  Q    So there was at least some question in the mind of

18  the person you were talking to, about vegetarian, since

19  there was a question mark?

20  A    Yes, ma'am.

21  Q    All right.  Anything else that you told them, when

22  you came in?

23  A    No, ma'am.

24  Q    And as you know, kind of my practice is to --

25  A    Well, other than the mental health issues.  I let

Page 26

1   them know about my medication.

2   Q    Who did you let know about your medication?

3   A    When they were doing my book in questions.

4   Q    Okay.  Who?  The deputy?  The medical person?  Who

5   did you identify?

6   A    I think it was Kayla Hawkins who did it.

7   Q    And you're looking at a piece of information there.

8   Was that on the medical intake?

9   A    Yes, intake questionnaire.

10  Q    Okay.  Completed by Kayla Hawkins?

11  A    Yes, ma'am.

12  Q    So it's your testimony, that Ms. Hawkins didn't

13  write that down?

14  A    I believe not.

15  Q    Did you sign your medical intake, or review it or

16  anything, before you --

17  A    No.  There is no spot for me to review it or sign.

18  Q    I'm showing you the same page that you just showed

19  me, but it looks like on my file -- page 127 of your

20  jail file, is that your signature, Mr. Avery?

21  A    Yes, I see that, but it's not the same one that I

22  have.

23  Q    Sure.  You've got a copy that appears to have cut

24  it off.  It appears to be --

25  A    It's one I received from you.

Page 27

1   Q    Well, whatever your allegation is is fine.  Of

2   course, your copy doesn't match with my copy.  In fact,

3   my copy doesn't say Amoxil, or IBU or anything on it,

4   does it?

5   A    Pardon me, I got it from the Turn Key.

6   Q    So on the copy that I'm showing you, of the same

7   document --

8   A    Yeah, I signed it.

9   Q    You signed it, and yet, there's nothing on here

10  about your mental health issues; is that right?

11  A    Not on that one, no, ma'am.

12              MR. WRAY: What's the last page of the

13          documents that you've got in your hands there?

14              THE WITNESS: They're all mixed up.

15              MR. WRAY: Will you hand that to her?

16              THE WITNESS: (Witness complied.)

17              MR. WRAY: Thank you.

18  Q    (BY MS. DAVIS) Now, on the same day, did you also

19  have a mental health screening?  Were you screened for

20  mental health issues?  Do you recall?

21  A    (Non-verbal response.)

22  Q    Just so we can kind of cut to the chase, on my

23  file, it's page number 126 of your jail file, and it

24  indicates a mental health screening form also completed

25  by Kayla Hawkins on the same day.  Is that your

Page 28

1    signature at the bottom?

2    A     Yes, ma'am.

3    Q     And you didn't indicate any of the -- that you --

4    A     Because I had never been in a mental institution,

5    so I said no.

6    Q     It said, "...or had psychiatric care."  So had you

7    had psychiatric care?

8    A     Yes.  Miscommunication.

9    Q     All right.  So y'all discussed your mental health

10   and --

11   A     No, we didn't discuss it actually.  She said, "Have

12   you ever had psychiatric care?"  And I was just going

13   down through there, saying, "No, no, no."

14   Q     Even though that wasn't correct, or are you saying

15   it was correct?

16   A     I'm saying it was incorrect.

17   Q     So you gave her the wrong answer?

18   A     Yes, because I came in under the influence, and I

19   wrote a grievance about that, which they took me back

20   down to medical, and redid all of my information.

21   Q     Okay.  So when I'm asking you what you told them at

22   intake, it's possible that you don't recall correctly

23   what you told them, because you were under the

24   influence?

25   A     No, it's not that I don't recall.  It's just that

Page 29

1    she was going through them so quickly, and I was under

2    the influence.  Yes, yes, no, yes, yes, no.  That's all

3    the questions were.  She didn't ask for an explanation.

4    She asked for a yes or no.

5    Q    Sure.  If you would have said no to didn't have

6    psychiatric care, what explanation would be needed?  A

7         None.

8    Q    All right.  So going down through, again,

9    referencing the allegations you've made against the

10   Benton County defendants -- and because of the nature of

11   your complaint, it may feel, Mr. Avery, like we're sort

12   of re-plowing ground.  We may ask you about the same

13   situations more than one time.  I just want to say that

14   on the front and, because we represent different

15   clients, the attorneys here.

16        So I just want to kind of handle that on the front

17   end.  You allege that Sheriff Holloway, and Captain

18   Guyll have a bed rest constraint, prohibiting the hiring

19   of a dentist, a custom of denying bed rest, a policy of

20   not giving TED hose.  Tell me about those policies.

21   Have you talked to either --

22   A    Nurse Shawna Hawkins.

23   Q    Hold on just a second.  Have you talked to either

24   Sheriff Holloway, or Captain Guyll about either of those

25   things?

Page 30

1    A     No.  As you know, they don't speak to inmates.

2    Q     Okay.  So you have not talked to them?

3    A     No.

4    Q     So you've sued them in their personal and official

5    capacities.  You and I have talked about these before,

6    but are you claiming that they are personally liable for

7    these allegations of -- regarding bed rest, TED hose,

8    and a dentist?

9    A     Yes, of course.

10   Q     So tell me what Captain Guyll did, regarding those

11   things.

12   A     It's negating a custom, practice, policy, and

13   procedure, which it doesn't have to be a written policy.

14   Q     As you know, that would be an official capacity

15   claim.  So I'm asking you, in your individual capacity

16   claim, what they did as an individual.

17   A     Entered into a contractual agreement with Keefe

18   Commissary, which violated my rights, pursuant to the

19   Arkansas Deceptive Trade Practice Act, signed by Captain

20   Guyll in 2016.

21   Q     And how does that have to do with bed rest?

22   A     You just asked me how that person was liable.  I'm

23   just given it to you.

24   Q     Right.  I'm asking you about -- again, we're going

25   -- if it helps to look at your Complaint --

Page 31

1  A    I have it right here in front of me.

2  Q    So document 17, if we're looking at your Complaint

3  --

4  A    Which will begin on 14, Sheriff Holloway, Captain

5  Guyll, Jane Does, created customs, practices, and

6  policies, in which a blanket ban has been placed upon

7  all books and magazines.  That's the order it actually

8  goes in.

9  Q    Okay.  Well, looking at claim number one on medical

10  --

11  A    Which is says type of claim, retaliation, or

12  nutrition, no dietary, on claim number three, which is

13  against Trinity Food Service.

14  Q    Okay.  So on page 8 -- and my page 8 looks like

15  this.  It's numbered at the top of the page.  This is

16  what I'm talking about.  This is what I'm trying to ask

17  you about, which I believe is related to claim number

18  one, your medical care claim.

19  A    I have a budgetary constraint prohibiting the --

20  Q    Mr. Avery again, I'm not asking you just to read me

21  your Complaint.  I'm asking for your testimony.  I

22  certainly don't mind you referencing in your Complaint,

23  to recall if you need to, but I'm asking you about how

24  these two have violated your rights, under this first

25  claim.  You've mentioned them by name in that paragraph,

Page 32

1  and said that it was continued.  Your Complaint can be a

2  little bit challenging to follow, because it moves

3  around a little bit --

4  A    Yes, ma'am.  I apologize.

5  Q    -- but that's okay.  That's what I'm trying to ask

6  you to do, is to clarify that for me today.

7  A    They did not specifically tell me that they were

8  going to deny me compression socks, or bed rest, no,

9  ma'am.

10 Q    And do you have any information that either of the

11 two of them were aware of your requests for bed rest, or

12 compression socks?

13 A    The only reference I can give for that, is the

14 statement of the nurses in medical, as to the reasons

15 why they wouldn't give me the TED hose, or the bed rest,

16 which it was per command staff custom.

17 Q    Okay.  So someone in medical apparently believed

18 that it was against the policy of the facility?

19 A    Yes, ma'am.

20 Q    And who was that person?

21 A    Shawna Stephens.

22 Q    And when was it that you were told -- I guess now

23 that I'm looking at your claim, and kind of trying to --

24 it says on March 23rd.  So this is when she told you you

25 couldn't have bed rest or compression hose?

Page 33

1    A    Yes, ma'am.  They had implemented a new policy,

2    doing away with the TED hose.

3    Q    And when she said "they", did she identify who they

4    was?

5    A    As in, you know, detention center staff, and

6    medical had come to the agreement, I believe.  That they

7    would discontinue the issuance of TED hose, because they

8    could be used as a weapon, allegedly.

9    Q    Okay.  And did you ever receive the compression

10   socks?

11   A    She had one pair and she gave them to me 48 days.

12   Q    So you received them?

13   A    Yes, ma'am.  I received them on 4-26-18.  The TED

14   hose were little bitty.  They were real small, and she

15   could not order any others, per, she said the policy.

16   Q    Did you use those?

17   A    Yes, ma'am, until they shrunk, and I couldn't use

18   them anymore.

19   Q    Okay.  How long did you use them?

20   A    I probably got a month use out of them; maybe a

21   little longer.

22   Q    And then they --

23   A    Just over all the washes, they shrink.  They began

24   small.  Here, I am issued a 2X.

25   Q    And did you receive any after that?

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 34

1    A      No, ma'am, I never got the second pair.

2    Q      And when was it that you left there?

3    A      8-29-18.

4    Q      And what treatment did you get for your varicose

5    veins?

6    A      In Benton County?

7    Q      Uh-huh.

8    A      The nurse gave me an additional blanket to prop my

9    leg up on, so that the pooling of the blood would

10   dissipate.

11   Q      So that was done through medical?

12   A      Yes, ma'am.  She gave me bed rest one time, two

13   days, until I seen a doctor, because of the varicose

14   veins.

15   Q      You allege that there's some policy against bed

16   rest?

17   A      Well, she stated that you almost had to have a limb

18   amputated to get bed rest.  She was being sarcastic, I

19   believe.

20   Q      So you're not aware of any policy against bed rest?

21   A      Just a custom of prohibiting it.

22   Q      Is that by the doctor?

23   A      That's by Benton County staff, such as Sergeant

24   Brady.

25   Q      What does Sergeant Brady tell you?

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 35

1    A    He said they don't give bed rest.

2    Q    If you have to get bed rest, who do you ask for it?

3    A    You go through medical, and medical refers you back

4    to Benton County staff.

5    Q    How do they do that?

6    A    Because it's --

7    Q    No, how?

8    A    How do they do it?

9    Q    For that medical decision.

10   A    She stated that it is -- unless it is life-

11   threatening, or a very severe case, they're not going to

12   give bed rest.

13   Q    So is it your allegation, then, that the medical

14   staff has to go to command staff, to get permission for

15   bed rest?

16   A    If it's not a serious life-threatening matter.

17   Q    Okay.  And that's based on what?  Your belief that

18   they get command staff to approve bed rest, is based on

19   what?

20   A    Just various statements by staff.

21   Q    Okay.  Tell me about those various statements.

22   A    The pod deputies.

23   Q    Okay.  What did the pod deputies say, that made you

24   believe that command staff approves medical decisions on

25   bed rest?

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 36

1    A    Because it's an overall custom of Benton County to

2    make you remain locked out of your cell.

3    Q    Let me back up.

4    A    I'm trying to tell you how this policy works.

5    Q    You set pod deputies said something.  I'm asking

6    you what they said.  I'm not asking you how this policy

7    works.  I'm asking you what they said.

8    A    They said unless I was dying, I would not be given

9    bed rest.

10   Q    Okay.  But no one said command staff has to

11   approved bed rest?

12   A    No.  That comes from Sergeant Brady.  No one said

13   specifically command staff.

14   Q    All right.  So Sergeant Brady just kind of said,

15   "Yeah, you got to be pretty hurt to get bed rest"?

16   A    More or less.

17   Q    But he didn't say --

18   A    He didn't say verbatim, "Sheriff Holloway has got

19   to tell me."

20   Q    All right.  And, again, we've been through this

21   process a lot of times.  I'm not trying to frustrate

22   you, or irritate you, and if we talk over each other,

23   then the record is very difficult.  So I will try not to

24   interrupt you, and you try not to interrupt me, okay?

25   A    Yes, ma'am.

Page 37

1   Q    So you assume then, that there is some influence

2   from command staff on bed rest issues; is that fair to

3   say?

4   A    No, ma'am, there's no assumption.  It states in the

5   Benton County policies, that any policy, custom,

6   practice, or procedure, will be signed off on by the

7   sheriff, or approved by the sheriff.  I have that in

8   writing.

9   Q    You kind of just talked in a circle.  It's a policy

10  that the policy is approved by the sheriff?

11  A    Yes, ma'am.

12  Q    So I'm asking you -- my question was are you

13  assuming command staff has to approve bed rest?

14  A    No, ma'am, I will not assume that.

15  Q    So what is your claim then, based on?  If is not

16  based on an assumption, what evidence is there of

17  command staff approving bed rest?

18  A    There's none.

19  Q    So anything else against Guyll and Holloway, on the

20  denial of medical care?

21  A    The only thing I have against Holloway, on the

22  denial of medical, is that he has entered into the

23  contract with Turn Key Medical -- Turn Key Healthcare

24  Clinics, and Turn Key Healthcare had no dentist on

25  hirer.  And per Benton County Detention Center policy,

Page 38

1    signed by Sheriff Holloway, it states that all inmates

2    will be given adequate dental and medical care.

3    Q    Right.  So you're claiming that they weren't

4    following policy; not that they were following policy?

5    A    Not with the dental, no, ma'am.  There was no

6    dentist there.

7    Q    Let me make sure I understand.  You believe that

8    the policy requires a dentist to be at the facility all

9    the time?

10   A    It requires me to have access to a dentist.  I went

11   from 3-12-2018, to 8-29-2018 with an abscessed tooth,

12   leaking pus, swollen all the way up into my nasal

13   cavity.

14   Q    And 8-29, is when you were transferred to ADC?

15   A    Yes, ma'am.

16   Q    And so when you came to ADC, then, was the tooth

17   extracted?

18   A    Immediately.  They pulled it because of emergency

19   need.

20   Q    And that was done on the day you arrived?

21   A    No, ma'am.  It was done about a week later, once I

22   got to a parent unit, to where they could do it, it was

23   removed.

24   Q    Now, did you see medical at all, during the period

25   of time between March 12th of 2018, and August 29th of

Page 39

1   2018?

2   A    Yes, ma'am.  And the nurses that kept seeing me,

3   kept apologizing to me, because there was no dentist

4   hired as of yet.

5   Q    Were you given any treatment at all for your tooth?

6   A    Antibiotics.

7   Q    What do you understand an abscess to be?

8   A    An infection into the tooth, going up into the

9   root.

10  Q    What treatment did you feel like you needed?

11  A    I was told that I would need a root canal.

12  Q    Were you given a root canal?

13  A    Or the removal of the tooth.

14  Q    Were you treated with antibiotics at ADC?

15  A    No, ma'am.  It was immediately pulled out.

16  Q    Anything else that Sheriff Holloway or Captain

17  Guyll did, with relation to your denial of medical care

18  claim?

19  A    No.  Just the dentist issue.

20  Q    So just the signing of the contract that led to the

21  dentist issue?

22  A    And his statement and policy, stating that all

23  inmates will be given adequate medical care, blah, blah

24  blah.

25  Q    And again, I don't want to sound like I'm trying to

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 40

1    confuse you, but your response is confusing me.  You're

2    saying that not having the dentist was a violation of

3    his policy; is that right?

4    A    I never got meaningful or adequate dental care,

5    which violated his policy.

6    Q    So you're not saying that the policy caused your

7    injury.  You're saying that your injury is evidence of

8    violation of a policy; is that fair?

9    A    The sheriff failed to adhere to his own policy, is

10   what I'm saying.

11   Q    So it was a violation of the policy, is what you're

12   claiming?

13   A    The sheriff violated policy, yes.

14   Q    So was the sheriff aware that you had a dental

15   need?

16   A    I don't know.

17   Q    Do you have any evidence at all, that he was aware

18   of your dental need at all?

19   A    The only thing I have of communicating with staff

20   is on the kiosk, which you have copies of everything

21   that I put in.

22   Q    So Sheriff Holloway never responded to any of your

23   grievances, did he?

24   A    No, ma'am.  The only Benton County person, that

25   responded to my grievances, would be Lieutenant Holt.

Page 41

1    Q     Okay.   This is where it gets a little complicated.

2    An official capacity claim is an allegation -- and if

3    you look at your Complaint form, it will tell you, that

4    a custom or policy caused the violation, caused your

5    injury.

6    A     Yes, ma'am.

7    Q     Let me give you an example.   You and I have talked

8    before in other cases about the shackles used on your

9    legs when you were transported, and how those caused

10   injury, and we talked about how it was the County's

11   policy to put shackles on you to transport you, and that

12   policy caused your injury, right?

13   A     Correct.

14   Q     The officer was following the policy.   So in the

15   context of this claim, you're not saying that it was the

16   policy that caused your injury, correct?

17   A     Not that policy.   But, I'm still waiting on a copy

18   of the policy and agreement that he signed with Turn Key

19   Medical, or Turn Key Health.   So at this point right

20   now, I don't have full discovery.   I cannot say that the

21   policy of Benton County -- no.

22   Q     Did not cause your injury?

23   A     It did not cause my injury.

24   Q     And so the only claim on this one, an official

25   capacity claim, against any Benton County official, is

Tiffanie N. Harrison, CCR

(501) 372-5115

Page 42

1    unknown?  You don't have any evidence of an official

2    capacity claim at this time?

3    A    Not at this time.

4    Q    And you haven't named either Holloway or Guyll, in

5    their personal capacity in that claim; is that right?

6    A    No, they're not named personally.

7    Q    Okay.  That's claim number one.  Claim number two,

8    the denial of US mail.  So that I can understand --

9    well, tell me about that claim.  What is your claim on

10   that?

11   A    Lieutenant Holt refused to allow me access to my

12   mail, outgoing and incoming personal mail.

13   Q    When were you denied access to mail?

14   A    Beginning on March -- I'll tell you exactly.

15   Q    I'm looking at a grievance, dated April 5 -- or

16   6th, I guess.  It's a handwritten grievance.  Does that

17   sound about right?

18   A    Yes, ma'am.

19   Q    So you were locked out of the system entirely?  Or

20   tell me what you experienced.

21   A    I was locked out of the system entirely.  It

22   wouldn't allow me to send out, or receive any postal

23   mail.  And how long did that last?

24   A    Until September 3rd.

25   Q    Until you left?

Page 43

1    A     No, that would be August 3rd.  I'm sorry.

2    Q     So you're telling me you couldn't get in the kiosk

3    system at all, until August 3rd?

4    A     I could get into the kiosk system, but I could not

5    access my postal mail, which was contained on the smart

6    jail communication.

7    Q     And you couldn't send anything out for that entire

8    period of time?

9    A     Only legal mail.

10   Q     And why did you understand that to be?

11   A     The judge had put a prohibition on my communication

12   privileges, telephone and email.

13   Q     And why was that?

14   A     Violation of the no contact order.

15   Q     Okay.  Had you violated the no contact order?

16   A     Yes.

17   Q     So you understood then, that denial of access to

18   have been authorized by Judge Green?

19   A     Only for the privileges of email and phone.

20   Q     You had violated it by email and phone?

21   A     Yes, ma'am.

22   Q     So did you write mail that was refused?

23   A     Yes, ma'am.  She refused to send my mail out.  Be

24   it to family or friends.  I couldn't respond to the mail

25   from Tracy Ellison.

Page 44

1    Q    Okay.  You said you were being denied personal

2    property letters.  What does that mean?

3    A    Once you purchase the emails, on the smart jail

4    mail, those emails and photos become your property, and

5    I was locked out of that, which we'll drop that issue.

6    Q    Okay.  So you're dropping the --

7    A    Denial of personal property.

8    Q    Okay.  It says, "And my phone has been removed and

9    blocked without due process."  What does that mean?

10   A    I'll drop that.

11   Q    What does that mean?

12   A    Well, it was just taken.

13   Q    When you were arrested?

14   A    No, ma'am.  It was taken in this action by

15   Lieutenant Holt.

16   Q    You had a phone?

17   A    My phone, you know, on the wall.

18   Q    You list a telephone number here.

19   A    Yes, because that was the number that I was

20   calling, which was my phone.

21   Q    I see.  You were calling a number that was listed

22   as yours?

23   A    Yes.

24   Q    Who had the phone number?

25   A    Jamie had it.

Page 45

1   Q    So that was the number that you were accused of

2   violating the no contact order by?

3   A    Yes.

4   Q    So you're dropping that denial of phone privileges?

5   A    Yes, ma'am.

6   Q    Now Lieutenant Holt indicated that you still had

7   access to postal mail.  Are you saying that that's

8   incorrect?

9   A    Yes.  That's definitely incorrect, ma'am.

10   Q    Anything else, with regard to your claim for denial

11   of the mail?

12   A    Yes.  During this denial of the mail, I lost my

13   grandmother and a child.  I found this out after I came

14   down to ADC.  My grandmother, I found out about reading

15   the obituary.  And the miscarriage of my child, I found

16   out about after getting to ADC.

17   Q    Who was it that was pregnant with your child?

18   A    Jamie.

19   Q    Anything else, with regard to your claim about

20   denial of mail?

21   A    Yes.  I had no alternative means of communication

22   with the outside world.  My total communication with the

23   outside world was barred and blocked by Lieutenant Holt.

24   Q    Was that by Lieutenant Holt, or was that by the

25   judge?

                    Tiffanie N. Harrison, CCR
                        (501) 372-5115

Page 46

1    A     By Lieutenant Holt.  The judge never said to

2    prohibit my United States mail.

3    Q     Anything else?  You've named Holloway and Guyll in

4    this claim too.  Are they --

5    A     Dismissed.

6    Q     And I presume from our discussion, that you're not

7    claiming an official capacity claim in that particular

8    claim, but rather just a personal capacity against Holt?

9    A     Yes, ma'am.

10   Q     And I may have put words in your mouth.  Are you

11   claiming an official capacity claim on the denial of the

12   mail?

13   A     No, ma'am.  It wasn't done pursuant to an official

14   capacity.  I mean policy, excuse me.

15   Q     And you did mark both official and personal, but

16   you're saying on the record, that it should've been just

17   personal for Lieutenant Holt?

18   A     Per Lieutenant Holt, on that claim alone.

19   Q     Let's see, that was claimed two.  Anything else on

20   claim two?

21   A     No, ma'am.

22   Q     On claim number three, which relates to the

23   service, I'm going to kind of cut through your

24   allegations against Trinity Food Services.  I'm not

25   going to ask you about that.  You'll have some questions

Page 47

1    about that.  You mentioned Lieutenant Holt, in that in

2    the discussion of it -- she's not named as a defendant

3    involved in claim number three, so I'm asking you is she

4    involved in claim number three?

5    A    Yes, ma'am.

6    Q    So why didn't you identify her as being involved?

7    A    A mistake.

8    Q    Tell me how Lieutenant Holt was involved in your

9    claim number three.

10   A    Lieutenant Holt, she was -- on 4-18 of '18, she

11   stated that she was the food director, and that any

12   concerns with food service would be directed through

13   her.

14   Q    She identified herself as having that title, or she

15   said anything related to food would be directed to her?

16   A    No ma'am.  She stated she had that title.  It's in

17   the response here.  Right here, ma'am.

18   Q    And so you're pointing to -- and she says on 4-18

19   at 10:04 -- this is where you were complaining about

20   your sandwich, that you were given a sandwich, where

21   other vegetarians received beans and rice.  Two

22   sandwiches, applesauce, and cookies.  And that you

23   attempted to resolve with Deputy Kemp.  You were forced

24   to accept a tray that was obviously lacking food.  And

25   I'm summarizing.  And the response was that on 4-13,

Page 48

1    that she forwarded your complaint to the kitchen.  Your

2    claims against Deputy Kemp will be looked into.

3         And then five days later on the 18th, she says,

4    "Thank you for addressing your concerns to the kitchen.

5    Please be advised that supervisor will be held

6    accountable for the errors in your diet.  As food

7    director, I'm committed to the quality of diets and

8    substitutions.  Expect an immediate turnaround in

9    receiving a quality diet tray.  I'm reaching out to

10   Lieutenant Darner, in reference to your claims about

11   Deputy Kemp."

12   A    Okay.  She says that she's the food director.  She

13   never corrected any entries.  Never took the appropriate

14   steps.  Deputy Kemp continued in his behavior, as in --

15   as I stated right here, whenever I attempted to resolve

16   the issue with Deputy Kemp, Deputy Kemp said that he had

17   already have 17 complaints about food service and that

18   he was about to lose his --

19   Q    Hold on one second.  You said she never corrected

20   anything?

21   A    No, ma'am.

22   Q    What you mean by that?  Did you get a wrong tray

23   every time?

24   A    Thirty-seven times in consecutive.

25   Q    Okay.  And what was wrong about you tray in --

Page 49

1   A    I'm a vegetarian vegan.  They were serving me meat.

2   They were giving me trays with inadequate portions.  I

3   went to Sergeant DeVore.  I went to Monday, Sergeant

4   Monday, and they've all sent those trays back to the

5   kitchen, and the kitchen would refuse to supplement them

6   at times.  It was so bad, that I went from 263 pounds --

7   Q    And again, you've sued -- is this a claim against

8   her in her personal capacity, or official capacity?

9   A    Both.

10  Q    Okay.  So tell me what she did in her personal

11  capacity.  Do you think she was fixing your try?

12  A    No, ma'am.  She told me to quit teaching them.

13  Q    Okay.  We're talking about the preparation, or

14  correction, of your tray.  So what involvement do you

15  think that she had, with regard to fixing your tray?

16  A    She was the intermediary with Trinity.

17  Q    Okay.

18  A    She had taken responsibility.  Like she said she

19  was going to make sure that the trays was corrected and

20  that quality and quantity would be sufficiently better

21  from there on.

22  Q    So you think if she hadn't said "I'm going to take

23  care of it", then you don't think she'd have any

24  liability?

25  A    Well, she would have liability, because she is

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 50

```
 1   personally involved, because she is the person that I
 2   have to file in all of my grievances, or any of my
 3   issues to, and with.
 4   Q    So you think she would be responsible, because she
 5   gets your grievances?
 6   A    Because she answers the grievances and corrects the
 7   issues.
 8   Q    What you think she does to correct the issues?
 9   A    She states --
10   Q    No, I'm asking you what you believe she does to
11   correct the issues.
12   A    The only belief I have is what she tells me in her
13   responses to my grievances, and she states that she
14   reaches out to Trinity Foods, to correct the issues in
15   quality and quantity.
16   Q    Do you think that she did reach out to Trinity
17   Foods?
18   A    I have no proof, because Trinity Foods never
19   responded to any grievances that she says that were
20   forwarded to Trinity Foods.
21   Q    Okay.  So you don't have any evidence that she did
22   or didn't?
23   A    Only her statements in the grievances.
24   Q    That she would?
25   A    That she would take an action.
```

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 51

1    Q    Okay.  And it may be possible that she did; is that

2    fair to say?

3    A    It's possible that she didn't.

4    Q    Okay.  It's possible that she did or didn't; you

5    don't know?

6    A    The only thing I can tell you for certain is that

7    the quality and quantity of the food never improved.

8    Q    Was she ever there when you got your tray?

9    A    Yes, I'm sure she was there.

10   Q    Was she physically present ever, in the pod, when

11   you got your tray?

12   A    No, ma'am.

13   Q    Tell me about your claim against her in her

14   official capacity.  What Benton County policy, practice,

15   or custom, caused your injury?

16   A    The only way that I was say it would be official,

17   is by her self-titled role, as food service supervisor.

18   Q    Your experience I'm sure has taught you that by

19   title alone, you're not responsible for things that

20   other people do.

21   A    No, ma'am, but when you take upon the

22   responsibility, and amount of authority, you take on a

23   certain amount.

24   Q    All right.  So just basically your official

25   capacity claim would be based on her self-proclaimed

Page 52

1   title?

2   A    Yes and the fact that she's the lieutenant over all

3   grievances.

4   Q    So she would be responsible for whatever -- if the

5   grievance was about toilet paper, and she said "I'll

6   take care of it", and it didn't get taken care of, would

7   it be your belief then, that she would be responsible

8   for that?

9   A    If she made a statement, I would imagine.

10  Q    So is that a yes?

11  A    Yes, I will say yes.

12  Q    So, basically, she says she's a supervisor, and it

13  doesn't get fixed, then it's her responsibility?  Or, if

14  her title says she's a supervisor, and it doesn't get

15  fixed, it's her responsibility?

16  A    She's the one who said she's a supervisor and she

17  said that it would be fixed.

18  Q    And it wasn't?

19  A    No, ma'am.

20  Q    Anything else against Lieutenant Holt, with regard

21  to the food claim?

22  A    No, ma'am.

23  Q    Okay.  Claim number four.  You mentioned

24  retaliation in the food claim.  Is that related to her?

25  A    Yes, ma'am.

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 53

1    Q    Okay.  So tell me about retaliation.

2    A    Lieutenant Holt made these specific quotations,

3    "Quit teaching them" statement, numerous times, in

4    regards to showing the guys how to get diet trays.

5    Q    What were you doing showing the guys how to get

6    diet trays?

7    A    Telling them what to put on the kiosk.

8    Q    What were you telling them to put on the kiosk?

9    A    As to their dietary restrictions upon religious

10   beliefs.

11   Q    So you were telling them, that if they wanted to

12   get a different tray, they should claim a religious

13   belief?

14   A    No.  If they came up and said, "Man, how come

15   you're a vegetarian", I would tell them why I'm a

16   vegetarian and what --

17   Q    What would you tell them?

18   A    I would tell them to look up Leviticus, in the

19   Bible, which that's where I derived mine from.

20   Q    So when someone said, "How did you get a vegetarian

21   tray", you said, "Look up Leviticus"?

22   A    No.  That's my reason for not eating meat and

23   stuff.  If they wanted to vegetarian tray, I told them

24   that you had to put in a request to Lieutenant Holt.

25   Put it under religious diet, explain your rationale and

                    Tiffanie N. Harrison, CCR
                       (501) 372-5115

Page 54

1   your reasonings for it, and there was too many people

2   doing that.

3   Q    Okay.  So you were just telling them if they

4   claimed it was religious, then they would get their diet

5   changed?

6   A    No.  I'd tell them why it was religious.  If you

7   don't believe this, you can't realistically put it.

8   Q    So were they converting to your religion?

9   A    No, ma'am.

10  Q    Okay.  So what religion were they expressing?

11  A    She was upset because of the multitude of the

12  requests she was receiving.

13  Q    I understand that, but I'm asking you what you were

14  telling them, and what they were doing, as a result of

15  your instruction.

16  A    I don't know what they were doing, other than

17  putting the request in with Lieutenant Holt.  I told

18  them what I did.

19  Q    And she asked you to stop telling them --

20  A    Quit teaching them, is what she said.

21  Q    We've got to stop talking over each other.

22  A    Yes, ma'am.

23  Q    So she asked you to stop telling them to put in a

24  diet change for religious reasons?

25  A    No, ma'am.  She said quit teaching them.

```
                                                          Page 55
 1    Q     Quit teaching them what?
 2    A     To put in grievances, I guess.  That is the way I
 3    took it.  Quit teaching them how to put in grievances.
 4    She would tell me every time she would see me out in pod
 5    control, "Avery, quit teaching."  "What do you mean?"
 6    Q     But you knew what she meant, though?
 7    A     Yes, ma'am.  Quit teaching them how to do
 8    grievances.
 9    Q     Because you were doing that?
10    A     Yeah.  A man has a right to file a grievance.
11    Q     Okay.  And so, you were receiving the right diet
12    before she said that to you?
13    A     The contents of the meals were messed up.
14    Q     So you weren't receiving the right diet, before she
15    said that you?
16    A     No ma'am.  It goes all the way through here.  She
17    took my Seventh-day Adventist vegetarian tray from me.
18    Q     Hold on.  Try to just answer my question, okay?
19    A     (Non-verbal response.)
20    Q     Were you receiving the correct diet before she said
21    that to you?
22    A     Yes, ma'am.
23    Q     You were?
24    A     Yes.
25    Q     So when was it that she said that to you?
```

Page 56

1  A    Two days prior to her taking my vegetarian -- my

2  Seventh-day Adventist vegetarian tray.

3  Q    Okay.  Can you give me an approximate time?  Month?

4  You don't have to give me an exact day, but you're

5  telling me that there was a period of time you were

6  getting the right tray.

7  A    Yes, ma'am.

8  Q    A minute ago, you told me you never got the right

9  try.

10  A    I was giving the Seventh-day Adventist tray, but

11  the trays were missing items and articles of food, so

12  there has always been an issue with that, but I received

13  the Seventh-day Adventist tray.

14  Q    Is it called the Seventh-day Adventist tray, or is

15  it --

16  A    Vegetarian diet tray, yes, ma'am.

17  Q    You were giving a vegetarian diet --

18  A    For the Seventh-day Adventist religious reasons.

19  Q    You were getting a vegetarian diet, and then

20  Lieutenant Holt said "Stop teaching them", which you

21  understood to mean, stop telling them how to get a

22  vegetarian diet for religious reasons, and then two days

23  later, yours was taken away?

24  A    Mine was taken away, yes, ma'am.

25  Q    And why were you told it was taken away?

Page 57

1   A    She said that I was trading items.

2   Q    So you requested that on 4-18?

3   A    4-3 is when it began.  4-18 is when she brought me

4   the paperwork.

5   Q    I see.  So it started on 4-3.  You signed for it on

6   4-18?

7   A    Yes, ma'am.

8   Q    And as part of that special diet request, you

9   agreed -- let me ask you, are these your initials going

10  down the side?

11  A    Yes, ma'am.

12  Q    And as part of that, you said you had a religious

13  need for the diet change, and that you were a Seventh-

14  day Adventist.  You had been a lifelong member of that

15  religion; is that right?

16  A    Yes, ma'am.

17  Q    It says you wanted a vegetarian diet.  You didn't

18  circle one.  You were given an option, but you didn't

19  circle one.  Is that an oversight?

20  A    Yes, ma'am.

21  Q    You agreed that you understood that the diet was

22  designed to meet the caloric performance and that you

23  understood that in order to meet the nutritional

24  content, you wouldn't trade any food from your tray, or

25  you would violate the terms of the diet you were asking

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 58

1   to be provided; is that fair?

2   A     That's fair.

3   Q     You also agreed not to purchase anything from the

4   commissary, that conflicted with the diet, or accepting

5   care packages that conflicted with the diet; is that

6   correct?

7   A     Yes, ma'am.

8   Q     And then you agreed, by putting your initials next

9   to the statement, that if you violated the terms of

10  that, you would be removed from it immediately, and

11  receive a regular tray; is that correct?

12  A     Yes, ma'am.

13  Q     So the allegation then was that you were trading

14  food, in violation of your agreement; is that right?

15  A     Yes, ma'am.

16  Q     And were you?

17  A     I gave away my carrots.  Yes, all hard items, I

18  gave away.

19  Q     So you were trading food?

20  A     Yes, I gave away all hard food items.

21  Q     So were you receiving anything in return?

22  A     Bread.

23  Q     And you knew that to be a violation of the

24  agreement?

25  A     Yes.

Page 59

1   Q    Anything else?

2   A    Yes, ma'am.

3   Q    What's that?

4   A    The trading of the food was a result of the failure

5   of staff to remedy and cure the deficiencies in this

6   tray, or the errors in it.  Because I was on a soft diet

7   vegetarian.  They were sending me hard carrots, hard

8   celery, hard cookies, which I couldn't chew.  By the

9   medical statement itself my tooth was -- there was just

10  no way -- what's the clinical term?  My tooth was

11  positive to percussion.

12  Q    What does that mean?

13  A    Any pressure, or any chewing on it, resulted in

14  extreme pain.

15  Q    Anything else on the diet?

16  A    No, ma'am, other than the fact that I weighed in at

17  263 -- which I mixed up.  I said 290.  That was my

18  mistake.  My book in weight was 263.  My weight on 4-16

19  was 216, as a result of the diet.

20              MR. WRAY: What was the date of the 216?

21              THE WITNESS: 4-16.

22  Q    (BY MS. DAVIS) Did they weigh you when you came in?

23  A    No, ma'am.  This is the one from medical when they

24  weighed me.

25  Q    When you came in, you stepped on the scale, and

Tiffanie N. Harrison, CCR
(501) 372-5115

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 60

1   they weighed you?

2   A    Yes, ma'am.

3   Q    All right.  Anything else about claim number three

4   regarding your food?

5   A    No, ma'am.

6   Q    Regarding Lieutenant Holt -- again as I mentioned,

7   you will be asked more questions about that, regarding

8   the other defendants.

9        All right.  So moving on to the question about your

10  books, magazines, newspaper, personal property.  I

11  believe that's claim number four; is that right?

12  A    Yes, ma'am.

13  Q    Okay.  Tell me about that claim.

14  A    They have a blanket ban policy in place at the

15  Benton County Detention Center, which prohibits any

16  books, magazines, or newspapers, coming from publishers,

17  booksellers, or any other outside source.

18  Q    Okay.  Are there newspapers in Benton County

19  Detention Center?

20  A    Yes, ma'am.

21  Q    And those are put in the pod every day?

22  A    Yes, ma'am.

23  Q    So newspapers are given every day.  And it's your

24  testimonial you don't have any access to any books?

25  A    No.  They have books there.  Most of them are torn

Tiffanie N. Harrison, CCR
(501) 372-5115

Bushman Court Reporting                    Tiffanie Harrison                    501-372-5115

Page 61

1   up, wore out, and they won't replace them.

2   Q    So they have books available to you?

3   A    A limited amount of books, yes.  Poor quality.

4   Q    And then, magazines?  What magazine was it that --

5   A    US News, People.

6   Q    So help me to understand, then.  The blanket ban is

7   against it coming in from somewhere?

8   A    Yes.

9   Q    Okay.  You are provided all of those things.  It's

10  just that you believe they ought to allow the source to

11  be different?

12  A    The courts have ruled that it's --

13  Q    I'm not asking you legal questions, and you can

14  make your legal arguments to the Court.  I'm asking you

15  to clarify your complaints.  It's not that you didn't

16  have access; it's that they couldn't come in from a

17  different source; is that correct?

18  A    The Benton County Detention Center, fails to

19  provide adequate books, newspapers, or magazines.

20  Q    Okay.  What about it is not adequate?

21  A    The books have become torn up, partial books, you

22  know.

23  Q    You believe you have a constitutional right to --

24  A    I have a First Amendment right, yes, ma'am.

25  Q    Hold on.  We can't talk over each other, so let me

Page 62

1   finish my question.

2   A    Yes, ma'am.

3   Q    Do you believe you have a constitutional right to a

4   good quality book?

5   A    Yes.

6   Q    And so, it was the condition of the books which

7   violated your rights?

8   A    No, ma'am.  It's the blanket ban prohibiting...

9   Q    Books to come in from another source?

10  A    Books to come in from a publisher, or anywhere

11  else.

12  Q    What book did you try to buy from a publisher?

13  A    Prisoners Self-help Litigation Manual.

14  Q    Where did you try to buy it?

15  A    Prison Legal News.

16  Q    And when did you do that?

17  A    Sometime -- it's in here.  It was either March or

18  April.  Probably April.  I put in a grievance on 5-3 --

19  no, that's on the mail, excuse me.

20  Q    Okay.  At some point, you put in a grievance about

21  it?

22  A    Yes, ma'am.  It's in here.

23  Q    All right.  Any other books that you tried to

24  purchase, from publishers?

25  A    Various books from Amazon Books, which were William

                    Tiffanie N. Harrison, CCR
                       (501) 372-5115

Page 63

1   Johnston, Westerns.

2   Q    How is it, Mr. Avery, that you were going to

3   purchase a book from Amazon Books?

4   A    Through another party, Charles Townsend.

5   Q    So was it --

6   A    They were going to purchase it in my name, yes.

7   Q    Okay.  So was the book purchased?

8   A    No.  I asked for the permission to purchase it, and

9   I was denied.  I purchased -- there was a book coming

10  from Prison Legal News, that had been ordered.  The

11  order was cancelled, because they denied it.

12  Q    Who ordered it?

13  A    Charles Townsend's mother, I believe.  It was his

14  mom or his father.  I'll have to get that for you.

15  Q    Okay.  And what is their name?

16  A    I don't know his mom and dad.  He asked his mom and

17  dad to do it for me, because it was a law book.  He was

18  also going to get me the Federal Rules of Civil

19  Procedure.

20  Q    On the kiosk in Benton County, do you have access

21  to the law library?

22  A    When it was working, yes, we did.

23  Q    Anything else on the books, newspaper -- you said

24  personal property?

25  A    No, that's good.

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 64

1  Q    So are you dropping your claim about the personal

2  property?

3  A    With the destruction of the Bible?

4  Q    Yes.

5  A    No, I'm not dropping it.

6  Q    Okay.  Well, who did it?

7  A    I never did get to find out who did it.  It was on

8  the video of the barracks.  I filed a grievance with

9  Lieutenant Holt, and Lieutenant Holt addressed the

10 matter.

11 Q    But you don't know who supposedly destroyed your --

12 A    She knew, because she looked, and did the follow-up

13 on it and everything.  It was addressed.  It was

14 admitted to, in this paperwork right here.

15 Q    Okay.  Have you filed a claim, other than your

16 grievance, for the value of the Bible?

17 A    No, ma'am.

18 Q    And you said you brought this in with you?

19 A    Yes, ma'am.  I brought it back from Washington

20 County Detention Center when I was out in court.  The

21 chaplain had given it to me, that has known me for

22 years.  He signed it.

23 Q    Okay.  When was that that you went to Washington

24 County?

25 A    March, April.  I went so many times.  I was going

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 65

1    back and forth.

2    Q    And what chaplain gave it to you?

3    A    Chaplain Don.  It's all in here, his name.

4    Q    What's the value of the Bible?

5    A    Hundred.

6    Q    Did you pay for it?

7    A    No, ma'am.  He did.

8    Q    Anything else?

9    A    No, ma'am.

10   Q    You've expressed a complaint about the policy which

11   would be an official capacity claim, but you haven't

12   indicated a personal capacity claim against any of these

13   defendants.  On this claim, can you identify that for

14   me?

15   A    On which claim, ma'am?

16   Q    On the books, newspapers, magazines.

17   A    I'm still waiting on that policy to come in.  I

18   sent another request for --

19   Q    Well, you described the policy.  So I'm asking you

20   on the personal capacity claims.

21   A    I don't have any -- I haven't seen who signed it

22   yet.  I don't know.

23   Q    Who signed what?

24   A    The policy.

25   Q    Okay.  And again, if the complaint is about the

Page 66

1   policy, it's an official capacity claim.  And so, we've

2   discussed that.  I believe you've expressed an official

3   capacity claim, without even needing the written policy

4   or who signed it.  I'm asking you about the personal

5   capacity claims.  What do you think, if anything, that

6   these three individuals did, regarding your books,

7   magazines, newspaper?

8   A    One of the individuals, being the final

9   policymaker, becomes personally involved in that, by

10  creating the policy.

11  Q    Is that the only personal capacity claim?

12  A    Yes, ma'am.

13  Q    All right.  Nothing else on that?

14  A    Nothing else on that.

15  Q    All right.  Your next claim, claim number five,

16  overcrowding.  Tell me about that one.

17  A    Benton County Detention Center has a custom of

18  placing three detainees in a two-man cell, which is

19  there about 60 square feet.

20  Q    Okay.  When were you in a two-man cell, with two

21  other detainees?

22  A    In March, April, May.

23  Q    Where were you housed?

24  A    D153.

25  Q    What cell?

Page 67

1    A    157.

2    Q    Were you housed with the same two individuals the

3    entire time?

4    A    No ma'am.  It varied.

5    Q    But you stayed in the same cell the whole time?

6    A    Yes, ma'am.

7    Q    Did you sleep on a bunk?

8    A    Yes, ma'am.

9    Q    Were you ever on the for?

10   A    Just when I first got there.

11   Q    How long was that?

12   A    Two nights.

13   Q    Were you in that cell?  Were you locked into that

14   cell?

15   A    Yes, ma'am.

16   Q    How long?

17   A    From 8:00 --

18   Q    a.m.?

19   A    At night, p.m., until 5:00 a.m. and from around

20   1:00 p.m. to 5:00 p.m.

21   Q    Okay.  So from 8:00 p.m. to 5:00 a.m., that's the

22   lights out time?

23   A    The lights go out at 10:00, yes, ma'am.

24   Q    And is it fair to say you would be sleeping the

25   majority of that time?

Page 68

1    A     Probably from midnight to 5:00.

2    Q     Is that a yes?

3    A     Yes.

4    Q     And then 1:00 p.m. to 5:00 p.m., what generally

5    happens during that time?

6    A     That was a forced lock down.

7    Q     What did you usually do?

8    A     They would turn off the lights, and they would tell

9    us it was nap time.

10   Q     So they would have you rest?

11   A     Put down for a nap, yes.

12   Q     This was the bed rest that you said you're being

13   denied?  They were forcing you to take it; is that

14   right?

15   A     Yes, ma'am.

16   Q     So for four hours a day, during the day?

17   A     Uh-huh.

18   Q     Four hours of bed rest each day.  And during those

19   times, you stayed fairly -- you know, for the majority

20   of the time in your rack?

21   A     Yes, ma'am.  There was no other room with three

22   people in a two-man cell.  You couldn't move.  There was

23   a stack of bunk made in the middle of the floor.  You

24   couldn't even walk past it.

25   Q     Were you able to get to the restroom?

Page 69

1    A    Only if the man on the floor got up and moved his

2    rack.

3    Q    Okay.  Was there ever a time that you weren't able

4    to get to the toilet in time?

5    A    No, ma'am, nothing like that.

6    Q    So it was a little more difficult, but not

7    impossible; is that fair to say?

8    A    That's fair to say.

9    Q    Any other damages, or problems, or injuries that

10   were caused by having two other people in there?

11   A    Other than the ventilation wasn't able to keep up

12   with the body heat of three individuals.  The walls with

13   sweat and mold.

14   Q    And when was that?

15   A    The whole time.

16   Q    Did you ever point out mold to anyone?

17   A    Yes, it's in the grievances.

18   Q    Okay.  And where was that?

19   A    Excuse me?

20   Q    Where was the mold?

21   A    On the walls, under the bunks.

22   Q    What was done?

23   A    They would bring bleach in occasionally.  I think

24   it was done twice, out of the six months I was there.

25   Q    Were you given cleaning supplies daily?

Page 70

1    A    Once in the morning, yes.

2    Q    Did you use them?

3    A    Yes.

4    Q    You said you saw mold on the walls.  Did you ever

5    get medical treatment for anything caused by the mold?

6    A    No, nothing by the mold.

7    Q    So you had no injury from that?

8    A    Other than having to seek mental health.

9    Q    Related to your previous diagnosis?

10   A    Related to the overcrowding, yes, ma'am.

11   Q    How was it that that led to your mental health?

12   A    Just the fact that the Ambilify wasn't helping me

13   to cope with the close proximity of the people and the

14   anxiety, and depression, and the PTSD, the loudness, the

15   people yelling at the door, screaming through the doors,

16   the excessive noise.  So I had to go back to see mental

17   health and get the Depakote.

18   Q    So it was people screaming at the doors from inside

19   their cell, or while you were in your cell?

20   A    While they were screaming inside the cell.  My

21   cellies were screaming and yelling.

22   Q    Okay.  If you were housed in a barracks, how many

23   people would be in their?

24   A    In an open barracks?

25   Q    Uh-huh.

Page 71

1   A    I don't know.  I've never been in one in Benton

2   County.

3   Q    Okay.  You've been in one at another locations?

4   A    Yes, in the prison setting.

5   Q    Approximately how many people did you share a space

6   with there?

7   A    Up to 65.

8   Q    But that didn't cause you any problems, the yelling

9   or the --

10  A    I'm on Paxil now, for it.

11  Q    So even being in open barracks causes you problems?

12  A    If it's overcrowded, yes.

13  Q    And how do you quantify that?

14  A    By the space for the amount of people.

15  Q    And how much space do you think each person needs?

16  A    A person is entitled to 60 square feet per person.

17  Q    And you think that's separate 60 square feet

18  connected to each other, or can they share some space?

19  A    I don't know.  That's what the court says, 60

20  square feet.  That's where I got that from.

21  Q    I'm asking you what you believe.

22  A    I believe that's per person.

23  Q    So if you've got three people, then you should have

24  --

25  A    180 square feet.

Page 72

1   Q    Okay.  And that's 24/7. or just during part of the

2   day?

3   A    Normally people aren't lock down in their cells all

4   day.

5   Q    I understand.  I'm asking you what you believe.

6   A    I believe that's constant.

7   Q    So 24/7?

8   A    (Non-verbal response.)

9   Q    Is that a yes?

10  A    Yes, ma'am.

11  Q    Anything else on the overcrowding issue?

12  A    The fact that the excessive noise, in the day room,

13  when we're locked out of the cells for the 5:00 in the

14  morning until 1:00 2:00 in the afternoon, it was so

15  excessive, that the guards on numerous occasions, or

16  Benton County Detention center staff, had to come in and

17  tell them to be quiet.

18       The sanitation of the showers, and the two public

19  restrooms, is what they call them, because they will

20  have to empty cells, and they used the toilets in those,

21  for 48 people, and they just clean them one time a day.

22  The showers are the same way, clean them once a day.  48

23  people utilize them, so that's 24 per shower.

24  Q    Do you have any medical issues -- you described

25  your mental health issues.  Do you have any medical

Page 73

1   issues, as a result of any of these things you've

2   identified?

3   A    The fact that there was no room to sit down, and I

4   was forced to continuously walk circles, which allowed

5   the blood to pool in my legs.

6   Q    Except for the four hours that you were forced to

7   lay down; is that right?

8   A    Yes.

9   Q    So you're talking about when you were locked out

10  during part of the day?

11  A    That's nine hours straight, yes.

12  Q    Is it nine hours straight, or is it nine hours --

13  A    From 5:00 in the morning, until 2:00 when they

14  locked us down.  Which it's either 2:00 or 1:00.  It

15  varies by the guard.  The norm is 2:00, which makes it

16  nine hours of continuous walking in circles.

17  Q    When was it that that occurred, that you had

18  pooling in your legs?  Was that every day, or was that

19  on certain occasions?

20  A    It's every day.

21  Q    And on each day that you experienced that, did you

22  put in a grievance?

23  A    No, ma'am.  I put in several grievances though.

24  Q    Okay.  So you don't know exactly which day that

25  was, but you're saying it's every day that you had to

Page 74

1   walk for nine hours straight, and --

2   A     That's why they gave me the TED hose, to help

3   alleviate that.  Then, she gave me an extra blanket, to

4   prop my leg up, to help the blood flow back down, after

5   we got locked down.

6   Q     Anything else about overcrowding?

7   A     No, ma'am.

8   Q     Did you ever get any infection, sickness, illness?

9   A     No, ma'am.

10  Q     Do you believe that to be a personal capacity

11  claim, or an official capacity claim?

12  A     It would be an official.

13  Q     So official capacity only?

14  A     Yes, ma'am.

15  Q     Okay.  Claim number six, your right to marry.  And

16  who was it that you were engaged to?

17  A     Tracy.  It's complicated.  I know there's Tracy and

18  Jamie.  Tracy made numerous phone calls to Benton

19  County.

20  Q     And what was she told?

21  A     That there was a policy stating that unless a

22  marriage license was obtained prior to my incarceration,

23  that I would be denied the right to marry.

24  Q     What did you understand that to be based on?

25  A     Official policy.

Page 75

1    Q    Okay.  Was the reasoning for that policy explained

2    to you?

3    A    No, ma'am.

4    Q    On April 1st, Lieutenant Holt responded to your

5    grievance about being denied a right to marriage.  And

6    in that --

7    A    What page?

8    Q    Page 7 of 58, is what it says on mine.  Your's is

9    numbered a little bit different from mine.  April the

10   1st is your grievance, and in that grievance, you said

11   "My fiancé has attempted to marry me before our child is

12   born."  So Tracy was pregnant with your child?

13   A    Yes.

14   Q    And is that the child that was miscarried?

15   A    No.

16   Q    So this particular child was born?

17   A    Yes, ma'am.

18   Q    And when was that?

19   A    October.

20   Q    October?

21   A    Yes, ma'am.

22   Q    So this was not your child that Jamie was pregnant

23   with?

24   A    No.

25   Q    So you were told by Lieutenant Holt that the

Page 76

1   clerk's office requires that you both be there together

2   to get a marriage license; is that right?

3   A    That's what she says, yes.

4   Q    And that it was a security issue to transport you

5   to the clerk's office for that reason?

6   A    Uh-huh.

7   Q    Do you have any reason to believe that's not the

8   policy, or you think that is the policy?

9   A    They transport people to the --

10  Q    It's a yes or no question.  Do you think that

11  Lieutenant Holt was telling you the policy, or do you

12  think that there was some other policy?

13  A    She was stating their official, yeah.

14  Q    So, yes, she was stating their policy?

15  A    Their policy is what denied me my right.

16  Q    And this is the policy that we're talking about,

17  that the clerk's office required you both to be there,

18  and that the detention center wouldn't transport you,

19  for security reasons?

20  A    The detention center's policy is the one that's an

21  argument right now, because they're saying it is a

22  security risk, to transport me to the county courthouse.

23  Q    For a meeting with your fiancé?

24  A    No.  It wouldn't be a meeting.  All I had to do was

25  stand in front of the court clerk and sign a piece of

Page 77

```
 1   paper.
 2   Q     With your fiancé there?
 3   A     In the court clerk's office; not right there.  I've
 4   done this before with Mary.  I know how the procedure
 5   works.
 6   Q     Okay.  And you did that in Benton County?
 7   A     In Washington County.
 8   Q     So you believe that Benton County should be doing
 9   what Washington County was doing?
10   A     No, ma'am, I didn't say that.  I'm saying that
11   their policy of not taking us to the court infringes
12   upon my First Amendment right to marry.
13   Q     Okay.  Anything else?
14   A     No.
15   Q     Any personal capacity claims on that claim?
16   A     No.  Just a claim against the policy.
17   Q     All right.  Claim number seven, commissary.  You've
18   identified Sheriff Holloway, and Captain Guyll on this
19   claim.  Tell me how -- are these personal capacity, or
20   official capacity claims?
21   A     I cannot say about Sheriff Holloway at this time,
22   because I haven't received the new updated Keefe
23   Commissary agreement form, because the old one that was
24   sent to me was from 2012, signed by then Sheriff
25   Ferguson, but the other agreement, about the amount of
```

Page 78

1    commissions paid by Keefe Commissary, which is 34

2    percent, was signed by Guyll.

3    Q    So your personal capacity claim would just be that

4    they signed the agreement?

5    A    Yeah, that they entered into an agreement.  It

6    could also be against the policy.

7    Q    And you think you have a constitutional right to a

8    particular price on objects you buy in the commissary?

9    A    I feel that I have a constitutional right protected

10   under the equal protection clause, that my rights,

11   pursuant to the Deceptive Trade Practice Act, ACA, title

12   4-80-817, which is Deceptive and Unconscionable Trade

13   Practices Act, which I feel that I have a constitutional

14   right to protections under that.

15   Q    You've actually litigated this claim before,

16   haven't you?

17   A    I turned it back, and followed the court's orders.

18   Sent it to the state court.

19   Q    Your previous same claim, in Washington County, was

20   denied by the court, correct?

21   A    The court denied to assert jurisdiction over a

22   state claim, yes.

23   Q    And said that you had no constitutional right?  A

24        No, they didn't say no constitutional rights.  They

25   said that they would decline to assert jurisdiction over

Tiffanie N. Harrison, CCR
(501) 372-5115

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 79

1    a state law claim, until I brought it forth in the state

2    court.

3    Q    And have you brought this in state court?

4    A    I brought it up in state court.

5    Q    Have you filed this claim somewhere?

6    A    Yes, ma'am.

7    Q    And where is it?

8    A    Washington County.

9    Q    I'm talking about this claim, the claim you're

10   asserting that's Benton County, has it ever been brought

11   up in state court?

12   A    No.  I brought up, the Deceptive Trade Practice Act

13   in state court.  And that's all I was required by, by

14   the court's order, was to address it in state court.

15   Q    Was there a final order in the state court case?

16   A    They would not let me bring it forth, because of my

17   indigent status.  They wouldn't let me go in forma

18   pauperis.

19   Q    Anything else on the commissary claim?

20   A    No.  The issue of the Magic Shave, being used as a

21   weapon.

22   Q    And I believe that's your last claim, what I will

23   call claim number eight; is that right?

24   A    Yes, ma'am.

25   Q    Claim number eight, this is the Magic Shave claim.

Page 80

1   Tell me about the Magic Shave claim.

2   A    Benton County has a policy of not giving us razors,

3   or shaves, for facial hair.  As an alternative, they

4   offer us Magic Shave, you know, for facial hair removal.

5   Magic Shave is not formulated for Caucasian skin.  It's

6   right there on the product.  It states "Specially

7   formulated for black man's skin."  I ended up with

8   facial burns.

9   Q    When was that?

10  A    In April or May.

11  Q    Were you treated for those burns?

12  A    I went to medical, and got my pills.  She gave me

13  face cream.

14  Q    At pill call, you were given some face cream?

15  A    Yes, ma'am.  I forgot what kind it was.  She gave

16  it to me three days in a row, until the redness and

17  stuff went out.  And also the fact that is used for a

18  weapon.  You can mix Magic Shave with hot water, and

19  it's a documented weapon.  There's been several cases

20  brought up in the federal courts over it.

21  Q    Was it used as a weapon against you?

22  A    No.

23  Q    So you're just saying that it could be?

24  A    It has been.

25  Q    Has it been against you?

Page 81

1   A    Not against me, but it's historically proven to

2   have been used as a weapon.

3   Q    Have you ever seen it used as a weapon?

4   A    Yes.

5   Q    When?

6   A    Missouri Department of Corrections.

7   Q    When?

8   A    1998.  Mixed hair grease and hot water with it,

9   threw it on the man's face, and it melted his skin off.

10  Q    You did that?

11  A    No ma'am.

12  Q    So in Benton -- you've never seen it used as a

13  weapon in Benton County?

14  A    I've seen it prepared in Benton County, but never

15  used.

16  Q    So after you were given the face cream, you didn't

17  shave again after that?

18  A    I didn't use it no more, no ma'am.

19  Q    Okay.  What did you do after that?

20  A    I let a grow out.  That was about the time that you

21  came and did my deposition, when I had the beard looking

22  thing.

23  Q    Okay.  And how long did you let it grow out?

24  A    Until I got to ADC.

25  Q    Did you shave it when you got here?

Robert W. Avery 3/8/2019                                                  Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 82

```
 1   A    Yes, ma'am.
 2   Q    So whenever you went over to Washington County
 3   during that time, you had a beard?
 4   A    I was only in Washington County for two days.
 5   Q    Okay.  Well, you indicated earlier, you went back
 6   and forth between the two.  Are you saying you just went
 7   over there once?
 8   A    I would go over there for a day, and come back the
 9   same day for court.
10   Q    When you do that, do the Benton County deputies
11   stay with you, or do they book you through Washington
12   County?
13   A    It depends on who the booking officers were.  There
14   were several times I just sat up in booking and I
15   wouldn't get booked in.  I would just go to court and
16   come back.
17   Q    So you let your beard grow from May until August?
18   A    Until I got to prison, yes, ma'am.
19   Q    Anything else about the Magic Shave?
20   A    No, ma'am.
21   Q    And that's the official capacity claim only?
22   A    Yes, ma'am.
23   Q    No personal capacity?
24   A    No personal.
25   Q    And just to be clear, the only Benton County
```

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 83

1   defendant that you had contact with in any way, was

2   Lieutenant Holt; is that right?

3   A     Yes, ma'am.  Yes, ma'am.

4   Q     And that was through grievances?

5   A     Through grievances and personal contact.

6   Q     And all the claims against either Sheriff Holloway,

7   or Captain Guyll, are because they signed an agreement,

8   or they were the final --

9   A     Policy creator, yes, ma'am.

10                    MS. DAVIS: All right.  I think that's all

11               of my questions for you, Mr. Avery.  I'll try

12               to go through this, while you're speaking with

13               the other attorneys, and I may have a follow-up

14               question or two for you at that point.

15                    THE WITNESS: Yes, ma'am.

16   BY MR. JACKSON:

17   Q    Hi, Mr. Avery.  My name is Ben Jackson.  I

18   represent Turn Key health.  Ms. Davis actually covered a

19   lot of the questions I would've asked you, so I'm going

20   to try not to re-plow old ground, and try to make this

21   as efficient as possible.

22        Prior to going to Benton County, March 12, 2018,

23   when was the last time you had seen a dentist?

24   A    It had been a long time.

25   Q    Years?

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 84

1   A    No.  Probably nine months or so, in ADC.

2   Q    Okay.  And so, the last dentist you would have seen

3   before March 2018, would have been at ADC?

4   A    Yes, sir.

5   Q    What ADC would that have been?

6   A    Probably Dermott, I believe, Delta Regional.

7   Q    At least in your adult life, have you been to the

8   dentist in the free world?

9   A    Yes.

10  Q    Do you know who that dentist is?

11  A    No, because she's out of Missouri, and it's been a

12  while.

13  Q    About roughly how old were you, when that was going

14  on?

15  A    25-26.

16  Q    Did you ever have any conversations with anybody at

17  Turn Key about fast tracking you to ADC?

18  A    No.

19  Q    How about anybody at the Benton County facility?

20  A    No.  I was held by the judge, for my court.

21  Q    Held in Benton County?

22  A    Yes, sir.

23  Q    I'm going to jump around a little bit.  First, let

24  me just ask you this.  I think you explained it, but I

25  want to make sure that I'm clear.  All of the claims

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 85

1    that you have against Turn Key Health, are in claim

2    number one of your amended complaint?

3    A    Yes, sir.

4    Q    And they relate to the varicose veins -- treatment

5    of the varicose veins in your legs and the tooth?

6    A    Yes, sir.

7    Q    And that's it, correct?

8    A    That's it.

9    Q    Did you ever go to a doctor About your varicose

10   veins, prior to March 2018, in the free world?

11   A    No. I haven't been free.

12   Q    All of the treatment of your varicose veins, before

13   March 2018, would have been in ADC?

14   A    Yes, sir.

15   Q    And that treatment consisted of TED hose and bed

16   rest?

17   A    Yes, sir, and limited duty scripts.

18   Q    Okay.  So limited work duty?

19   A    Yes, sir.

20   Q    When you came to Benton County on March 12, 2018,

21   were you wearing TED hose then?

22   A    No, sir.  They wouldn't let me bring them in.

23   Q    When was the last time you had been wearing TED

24   hose before March 12th of 2018?

25   A    March 11th.

                    Tiffanie N. Harrison, CCR
                       (501) 372-5115

Page 86

1    Q    Where did you get those TED hose?

2    A    I left ADC with them.

3    Q    So they were prison issued?

4    A    Yes, they were prison issued.

5    Q    You mentioned the antibiotics you got from Turn

6    Key, but you also got ibuprofen and Orajel, correct?

7    A    Yes.

8    Q    And you were being seen about your complaints

9    related to your legs and your teeth, you just don't feel

10   that they were giving you adequate treatment for that;

11   is that correct?

12   A    The Turn Key nurses, kept telling me that yes, I'm

13   on the doctor/dentist list, but Turn Key Medical had not

14   hired a dentist, so therefore, I wouldn't see the

15   dentist, until one was hired.

16   Q    So basically, they were saying, "We're trying to

17   find a dentist, and when we find one, we're going to

18   send you to it"; is that what you're telling me?

19   A    I'll tell you here in just a second exactly what

20   she said.  "Mr. Avery, we're working on getting a

21   dentist.  I'm sorry for the delay in this issue.  We

22   will continue to work on this.  Fran Fonte."

23   Q    Did you get TED hose when you came here to ADC?

24   A    Yes.

25   Q    How soon after you got here, did you get them?

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 87

1    A     Within a week.

2    Q     Have you had them since?

3    A     Yes.  They're actually in the barracks right now,

4    drying.

5    Q     How often do you wear the TED hose?

6    A     Daily.

7    Q     How many hours a day?

8    A     From the time I get up, until the time I take a

9    shower.  If I take a shower, late in the evening, then I

10   go to bed on my rack.

11   Q     Do you take them off when you go to bed?

12   A     Yes, because I have an extra blanket that I prop my

13   leg up.

14   Q     Since you've been here in ADC, have you gotten any

15   other treatment for your varicose veins, besides the TED

16   hose, and the limited work duty, and the blanket?

17   A     They said there's nothing, other than surgery, that

18   will do anything about.

19   Q     Have you seen a doctor about it?

20   A     Yes.

21   Q     Who did you see?

22   A     I don't know the name.

23   Q     Was it here?

24   A     One was here, and the other one was at the Delta

25   Regional Unit, before I transferred up here.

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 88

1   Q    Okay.  And what did they say about your varicose

2   veins?  What did they say was causing it?

3   A    No cause.  They didn't give me a reason.  I've been

4   told that some of it is hereditary.

5   Q    And what do they say to treat it?  Stay off your

6   feet and use TED hose?

7   A    Yes.

8   Q    And the only other option is surgery?

9   A    Yes.  They were going to go inside there, and fish

10  the veins out.

11  Q    I guess obviously, you haven't had that surgery,

12  right?

13  A    No.

14  Q    Have you not had that surgery, because they didn't

15  feel like it was appropriate for you, or because you

16  didn't want to, or why?

17  A    ADC won't pay for it, which Correct Care Solutions

18  won't.

19            MR. JACKSON: I think that's all the

20        questions I have for you, Mr. Avery.  Thank you

21        for your time.

22  BY MR. WRAY:

23  Q    Mr. Avery, my name is Scott Wray.  I'm here

24  representing Trinity Services Group and Keefe

25  Commissary.  I do have a few questions for you.  What I

Page 89

1    want to do is kind of focus on some of the things that

2    you've talked about with Ms. Davis already, and I will

3    have some of the questions.

4         Can you tell me how much you currently weigh?

5    A    275.

6    Q    When was the last time you weighed?

7    A    About a month or two ago.

8    Q    You showed me some documents a few moments ago

9    about some weight -- or some weights that were taken

10   when you were at Benton County Detention Center,

11   correct?

12   A    Yes, sir.

13   Q    And one of those was showing a weight of 216 in

14   April, correct?

15   A    Yes.

16   Q    And another one was showing 263 in March of 2018,

17   correct?

18   A    Yes, sir.

19   Q    In your Complaint --

20   A    Yes, I misstated the weights.  I said 290, down to

21   262.

22   Q    Okay.  So the 290 on March 13, 2018 is incorrect?

23   A    Incorrect.

24   Q    Where did that number come from?

25   A    I thought that's what I weighed.  I didn't know for

Page 90

1   sure, until I got discovery, because none of this

2   information was made available to me.  I seen the real

3   weights, through the doctors notes, and the booking

4   weight.

5   Q    Up until the time that you received the production

6   from Benton County, and from Turn Key, you had no idea

7   how much you weighed; is that correct?

8   A    Until I went to medical one time, and she said I

9   was down to 216.  I knew I was losing weight.  You drop

10  that much weight, you can tell.

11  Q    Did she take a measurement of you immediately

12  before telling you that?

13  A    A measurement?  You mean of weight?

14  Q    Yes, sir.

15  A    Yes.  She put me on the scales.

16  Q    And who was it that took your weight?

17  A    On 3-12, it would've been Kayla Hawkins.  On 4-16,

18  it would've been -- can't read her writing.  Here's the

19  name, if you can make it out there.

20  Q    So you believe that you were losing weight?

21  A    Yes, I know I was.

22  Q    How did you know it?

23  A    You can tell.  Your pants start fitting looser.

24  Your size goes down.

25  Q    But as to your actual weights, the only way that

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 91

1   you know how much you weighed at any given time comes

2   from the records that you were provided?

3   A    Yes.

4   Q    So you are relying on those records for those

5   numbers?

6   A    Yeah.  There was no way -- I was in jail.  How am I

7   going to get on the scale?

8   Q    Fair enough.  And so, in turn, I should be given

9   the same ability to rely on these records, should I not?

10  A    If they're the same ones I've got, yes.

11  Q    And so is the records show that on 6-11-2018, you

12  weigh 251 pounds, you would have nothing to dispute

13  that, correct?

14  A    No, because she told me that I went from 263, to

15  216, back to 250, it seems like.  Which I won't argue

16  that.

17  Q    Okay.  And so, as I understand your testimony

18  earlier, you indicated that you had an abscessed tooth

19  the whole time you were at Benton County Detention

20  Center, correct?

21  A    Yes.

22  Q    And that caused you problems with eating certain

23  foods, correct?

24  A    They gave me a vegetarian soft try.

25  Q    Okay.  But if you will please just answer my

Page 92

1    question.

2    A    I did.

3    Q    That caused you problems with eating certain foods

4    that they gave you on your tray, correct?

5    A    That's why they gave me the soft tray.

6    Q    It's a simple yes or no.

7    A    No.  After they gave me the soft tray, as long as

8    they gave me the food that was prescribed to me, per my

9    diet, I could eat it.

10   Q    So earlier you testified that you couldn't eat raw

11   carrots, or carrots, correct?

12   A    That's not part of my diet, vegan soft diet.

13   Q    Whether it is a part of your diet or not, I want

14   you to confirm for me that you were unable to eat

15   carrots, because of your tooth.

16   A    I was unable to eat the food that Trinity was

17   providing to me, because it failed to comply with my

18   dietary orders from the doctor.

19   Q    What dietary orders were those?

20   A    The doctor ordered a soft tray.

21   Q    Okay.  And what was the reason for the soft tray?

22   A    The abscessed tooth.

23   Q    Did you ever receive a soft tray?

24   A    Yes, I received a soft tray, but many times, the

25   tray had hard food items on it.

                Tiffanie N. Harrison, CCR
                    (501) 372-5115

Page 93

1    Q    Would you agree with me that fresh fruits and

2    vegetables are hard?

3    A    Certain ones, yes.

4    Q    Carrots, for example.

5    A    Carrots, celery.

6    Q    Apples?

7    A    Apples.

8    Q    Pears?

9    A    Depends.  If they've been canned, they're soft.

10   Peaches are soft.

11   Q    So the reason you were asking for the soft tray,

12   without respect to vegetarian or non-vegetarian, was

13   because of the tooth?

14   A    Because of the tooth.

15   Q    And the reason you were asking for a vegetarian, or

16   a vegan tray, was because of your religious beliefs?

17   A    Religious beliefs, yes.

18   Q    Any other reason for that?

19   A    No other reason.

20   Q    I think you indicated earlier -- you use the term

21   vegetarian and vegan kind of interchangeably.  In your

22   mind, is there a difference between the two?

23   A    Yes, sir, there's a difference between the two.

24   Q    What is the difference?

25   A    A vegetarian can eat milk products, so on and so

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 94

1    forth.  And vegan doesn't get that.  A vegan falls under

2    the guidelines of Buddhism, Hinduism, and so forth.

3    Q    What kind of diet did you request?

4    A    I had originally requested the Seventh-day

5    Adventist vegetarian diet.  Due to all of my grievances,

6    and the issues I had with Lieutenant Holt, and the

7    Trinity Food Service, my Seventh-day Adventist diet was

8    taken away and I had to circumvent that, and ask for a

9    vegan tray, so that I wouldn't be forced to eat meat

10   products.

11   Q    So you have been a lifelong Seventh-day Adventist?

12   A    Yes, sir.  My ADC records show I'm Seventh-day

13   Adventist.

14   Q    Is being a vegetarian a requirement of Seventh-day

15   Adventist religion?

16   A    It is professed to be a...

17   Q    Are you familiar with 28 Fundamental Beliefs in

18   Seventh-day Adventist Church?

19   A    Vaguely.

20   Q    I'm going to hand you a document, that is put out

21   by the Seventh-day Adventist Church that shows the 28

22   fundamental beliefs.  Can you look through there and

23   tell me where it says vegetarian diet is required?

24   A    It does not say in there, anywhere.  I know that

25   for a fact.  As I said in the beginning of this, I

Page 95

1    derive my believes about vegetarianism, through

2    Leviticus which states that you will not eat meat.  You

3    will not eat anything unholy.  As the people at the

4    Gentry Seventh-day Adventist Academy, they all practice

5    vegetarianism.  My girlfriend, Jamie DiFrancisco who

6    influenced me on this, is also Seventh-day Adventist

7    vegetarian.  A sincerely held belief is considered

8    viable.  As long as I sincerely and truly believe that

9    meet is unclean and unhealthy for me, and it violates my

10   spiritual beliefs, I'm entitled to that.

11   Q     You were intoxicated, when you were booked into the

12   Benton County Detention Center; correct?

13   A     Yes.

14   Q     What caused your intoxication?

15   A     Methamphetamine.

16   Q     Is methamphetamine part of the Seventh-day

17   Adventist religion?

18   A     No.  I didn't say I was a saint.  We are all

19   sinners and fall short of the glory of God.

20   Q     I think you indicated to Ms. Davis that you did in

21   fact receive the diets that you requested, while you

22   were at Benton County Detention Center, correct?

23   A     Yes.  My argument with Trinity Foods is that they

24   failed to put the proper amount of food on there, to

25   meet the caloric intake, which is the reason why I lost

Page 96

1    47 pounds, from 3-12 to 4-16.  47 pounds is an unhealthy

2    amount.

3    Q    Why don't we do this?  Why don't you tell me,

4    you're claiming that Trinity Services has violated your

5    constitutional rights.  And you just indicated that

6    maybe the amount of food is insufficient.  How else did

7    Trinity violate your constitutional rights?

8    A    They failed to provide the proper nutrition.

9    Trinity Foods, acted with retaliation for all of these

10   grievances, right here that I filed.  Numerous times, my

11   tray was messed with.  I was given smiley face bean

12   patties.  I was given various foods prepared in an

13   unsanitary manner.  I took all of this to the attention

14   of Benton County staff.  Once I would filed a grievance,

15   my tray would come back further messed up, further

16   tampered with.

17   Q    Let me stop you there.  Let's talk about what you

18   mean by proper nutrition.  What do you mean by that?

19   A    I have the right to a nutrition that sustains body

20   mass -- I mean, body weight, and muscle mass, that

21   doesn't cause me hunger pains, and doesn't -- you know,

22   to lose a massive amount of weight, 47 pounds in 32

23   days.

24   Q    What do you believe gives you that right to be free

25   from losing weight while you're --

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 97

1    A    Nothing about losing weight, but having to suffer

2    while you're losing weight.  The hunger pains, the

3    mental anguish, the emotional that goes along with that.

4    It is clinically proven that 47 pounds or that much

5    drastic weight loss in that short period of time is

6    unhealthy.

7    Q    Did you suffer any illness as a result of your

8    losing weight?

9    A    No illnesses.

10   Q    Do you know how many calories you are receiving on

11   a daily basis?

12   A    I have what Turn Key alleges I was receiving, but

13   the date of the alleged menu that was being provided by

14   Turn Key, was after the fact.  This diet wasn't

15   implemented until July 2018.  This claim starts way

16   prior to that.

17   Q    What proof do you have that it wasn't implemented

18   until afterwards?

19   A    By the policy itself, implemented on such and such

20   date.

21   Q    And again, if you would be so kind as to tell me,

22   what is it about these documents, that have been bates

23   stamped as Trinity 1 through 4, I guess -- 1 through 5?

24   What is it about those documents that you're indicating

25   a policy implementation?

Robert W. Avery 3/8/2019                          Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

                                                                        Page 98

1    A    Right here, the Trinity Services Group, the menu

2    provided by Trinity, beginning on 7-5-2018, done by

3    dietary consultant, Margaret Kirsch.

4    Q    So Trinity had a dietitian?

5    A    As of 7-5-2018.

6    Q    Do you know that they didn't actually know that

7    they didn't have a dietitian, prior to 7-5-2018?

8    A    It was stated that there was no set menu for

9    vegetarians, or vegans, and this policy is only for

10   vegetarians, not vegans.

11   Q    But you're not a vegan, correct?

12   A    Incorrect.  I was given the vegan diet tray.

13   Q    Okay.  I thought earlier, you said you were not --

14   A    I understand that, but after all my grievances, and

15   everything else, I had to put in to get a vegan diet

16   tray.

17   Q    So you're just kind of changing it as the wind

18   blows?

19   A    No, I'm not changing it.  After retaliation, on

20   behalf of Trinity, and Lieutenant Holt, I was taken off

21   of my Seventh-day Adventist diet tray.  Because I do not

22   eat meat, I had to get a vegan diet tray.

23   Q    Mr. Avery, I'm having a hard time following you,

24   because you indicate at some points in this deposition,

25   that you're getting a vegetarian tray, that you're

                    Tiffanie N. Harrison, CCR
                        (501) 372-5115

Bushman Court Reporting              Tiffanie Harrison                    501-372-5115

Page 99

1   getting a vegan tray, but then at other points, you're

2   saying that you weren't.  What am I supposed to believe?

3   A    I told you that it was taken away as an act of

4   retaliation, and then I had to go back on a regular diet

5   tray.  I had to put in for a different tray, which was

6   vegan, because she would not give me a vegetarian tray

7   again for Seventh-day Adventist, because I was trading

8   off the hard food items that Trinity kept giving me,

9   which were cookies, carrots, celery, which I could not

10  eat.  Which Trinity insisted upon putting on my tray,

11  despite the fact that it was labeled "soft vegetarian".

12  Q    Tell me the process of how you receive your food

13  from the kitchen.  How are the meals provided?

14  A    They have an inmate assigned to prepare -- under

15  the supervision of the Trinity employee, to prepare the

16  special diet trays.  The inmate then, takes and prepares

17  it, off of their list of foods available.  Pursuant to

18  the testimony of my witnesses, which were trustees

19  utilized at this period of time, they were allowed to

20  put in, at their discretion, items of food.

21  Q    Who are these people you're referring to, these

22  witnesses?

23  A    You got them coming in your responses to your

24  interrogatories.

25  Q    When am I going to get those?

Page 100

1    A    I just received them yesterday, so you will get

2    them within a couple of days.  All the names and stuff

3    are written down in the bottom.

4    Q    All right.  Just so I'm clear on what we're talking

5    about, with respect to your claims against Trinity,

6    you're upset with Trinity, and claiming that they failed

7    to provide you proper nutrition, as you put it, and that

8    that relates to not having enough food, correct?

9    A    Uh-huh.  The drastic weight loss kind of proves

10   that point, 47 pounds.

11   Q    And I'm just making sure I understand what your

12   claims are.  You're saying not enough food, correct?

13   A    And they allowed inmates --

14   Q    Mr. Avery, I understand all of that, and I promise

15   you, I will let you go through all of those.  What I

16   want to do is get you to confirm for me, if you will,

17   that a lack of quantity is one of your issues?

18   A    And quality.

19   Q    All right.  So let's talk about quantity first, and

20   then we'll talk about quality.  Fair enough?

21   A    Fair enough.

22   Q    Tell me what kind of quantity you believed you

23   needed.

24   A    If they were following the vegetarian diet, which

25   you provided as what their baseline is of what I was

Tiffanie N. Harrison, CCR
(501) 372-5115

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 101

1    supposed to receive, they failed to provide what is on

2    that menu, if you want to go by that and use that as

3    your evidence.  I have grievances and witnesses, that

4    have shown that Trinity Foods served me nine consecutive

5    days, breakfast lunch and dinner, beans and rice.

6    Nowhere on the menu, does it show that.  Beans and rice

7    for breakfast.  They failed to give me protein

8    replacements, as well.  This menu was not adhered to.

9    Q    Do you know the composition of beans and rice, as

10   far as --

11   A    It's protein --

12   Q    Wait a minute.  Now, I'm going to let you talk as

13   much as you want, but you've got to let me say my

14   question first, so that you and I know exactly what

15   we're talking about.  Fair enough?

16   A    Fair enough.

17   Q    Do you know the makeup of beans and rice, as it

18   relates to the amount of fat, the amount of protein, the

19   amount of carbohydrates, and the amount of calories?

20   A    If it is put together accordingly, with 2 to 1

21   ratio, it can have the same amino content as meat.

22   Q    Are you answering yes to my question?

23   A    I'm just giving you a vague answer.  Yes.

24   Q    Yes you're answering yes to my question.

25   A    I'm answering yes that beans and rice has protein

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 102

1    in it, yes.

2    Q    Okay.  So that wasn't my question, but it raises

3    another question.  So I'll ask you this question.  Are

4    you telling me, and the court if needed, that beans and

5    rice can satisfy your daily needs for protein,

6    carbohydrates, fats, and calories?  Yes or no.  It's a

7    simple question.

8    A    Sure, if they want to feed it to me three times a

9    day, they could, but according to your set menu, that's

10   not what I'm supposed to be getting, because it fails to

11   have fresh fruits or vegetables, which are required.

12   Q    But you gave those away, correct?

13   A    No, I didn't.  I was still a vegan, regardless.

14   The whole time, I maintained that I was a vegetarian or

15   vegan.  That is vegetables, sir.  Not meat.

16   Q    You gave your vegetables away?

17   A    No, sir.

18   Q    You didn't?

19   A    Because they were hard, and they violated the soft

20   diet tray restriction.

21   Q    So you want to a very specific tailored diet, for

22   Robert Avery, correct?

23   A    No, I don't want a specific tailored diet.  I

24   wanted diet that will not cause me to lose 47 pounds, in

25   32 days.

Page 103

1    Q    Were you in fear for your life?

2    A    I was sick over it.  I was very afraid.  50 pounds?

3    That's crazy.

4    Q    You weren't ill, and you've already indicated to

5    me, it didn't make you ill, correct?

6    A    Right.

7    Q    Did you obtain any --

8    A    I lost muscle mass.

9    Q    Wait a minute.  Wait a minute.

10              CORRECTIONAL OFFICER: Avery, you got to let

11          him talk.

12              THE WITNESS: I got this.

13   Q    (BY MR. WRAY) It only works if you let me talk,

14   okay.  You've got to let me ask my questions, and then

15   you can respond, and I will let you develop your

16   answers, okay?

17   A    Okay.

18   Q    How did you know you were losing muscle mass?

19   A    Because you can look at yourself in the mirror and

20   see yourself getting smaller, your chest getting

21   smaller, arms getting smaller.

22   Q    Would you agree that that could also be a loss of

23   fat?

24   A    It could be both, but at 263, I was working out.  I

25   had weights at the house.

Page 104

1   Q    Before you went into the Benton County Detention

2   Center?

3   A    Yeah.

4   Q    So you were in the Benton County Detention Center

5   for about five months, correct?

6   A    Something like that.

7   Q    And is it possible that you could lose muscle, just

8   by not working out anymore?

9   A    I couldn't workout because I didn't have the

10  energy, due to the lack of food.

11  Q    You weren't working out though, correct?

12  A    No.

13  Q    No, that's incorrect, or no that's correct/

14  A    I wasn't working out.

15  Q    Okay.  Are you aware of any other inmates receiving

16  certain diets due to religious reasons in the Benton

17  County Detention Center?

18  A    No.  I was the only one that I knew of in the

19  barracks, that was getting it for religious -- no,

20  excuse me.  That is wrong.  There was a Laotian guy in

21  the barracks, that was getting a vegan diet as well.  He

22  was only there for a short period of time.

23  Q    Do you know what his religious reason was?

24  A    Buddhist.

25  Q    And he received a vegan diet?

Page 105

1   A     Vegan diet.  He received peanut butter, fresh

2   fruits, fresh vegetables.

3   Q     Which you generally would not eat the fresh fruits

4   and fresh vegetables, though, correct?

5   A     Just because of the mouth, yes, sir.

6   Q     Would you agree that that makes it more difficult

7   to provide a vegetarian diet, when you can't eat the

8   main thing on that diet, vegetables?

9   A     The main thing would've been peanut butter, which

10  wasn't given, because his main deal on his vegan diet

11  was the peanut butter.  The other stuff was accessories.

12  Q     I understand all of that, but do you agree it makes

13  it more difficult?

14  A     Oh yeah it makes it difficult, but not impossible.

15  Q     Do you know how many calories a day you were

16  receiving at the periods of time, when you were upset

17  with what you were getting on your tray?

18  A     I had no way to measure it, and no way to know.  I

19  know what I was told.  2300.

20  Q     Do you know how many grams of protein, or how many

21  grams of carbohydrates, or how many grams of fat you

22  were getting, on the days that you were upset with what

23  you were getting on your tray?

24  A     I was told that the diet was supposed to have 56

25  grams.  That's somewhere in here from Lieutenant Holt.

Page 106

1  Q    Fifty-six grams of what?

2  A    Protein per day.

3  Q    But you don't know whether that was true or not,

4  correct?

5  A    I had no way of verifying or deny -- confirm or

6  deny, excuse me.

7  Q    What is a rubber bean patty smiley face?

8  A    That was the vegetarian been patty, the six ounces

9  that's on this list.  The vegan patty, which is supposed

10  to be six out ounces, of mushed up beans, and various

11  vegetables, you know, kind of like a vegan hamburger.

12  They had turned it into a smiley face and burned it, as

13  a response to the grievances, on the kitchen.

14  Q    And so, when you say turned it into a smiley face,

15  tell me what you mean.

16  A    It was a smiley.

17  Q    And it was burned?

18  A    Burnt.

19  Q    And it was made up of beans, vegetables, things of

20  that nature?

21  A    That you put into a blender, and turned it into a

22  paste, and fry it, or bake.

23  Q    So that particular patty, as far as what it was

24  made of, satisfied your dietary requirements, correct?

25  A    Until it was burnt hard.

Page 107

1    Q     Again, Mr. Avery, you've got to answer my question.

2    With respect to what it was made of, it satisfied your

3    dietary requirements, correct?

4    A     Yes.

5    Q     And you also indicated to me, as you referenced,

6    that that been patty is one of the items listed on the

7    menu, that we were talking about earlier, correct?

8    A     Yes, it's on their.

9    Q     So you did get some of the things that were on this

10   menu?

11   A     After 7-5-2018.

12   Q     So if I go back and I look at the grievances, your

13   complaints about bean patty smiley faces, are going to

14   be after July of 2018?

15   A     I don't know.  That's what I'm looking back for.  I

16   know I got them periodically, but nothing like your menu

17   says, on specific days.  Before July, the diet was

18   inconsistent.  It was just whatever haphazard, thrown

19   together.

20   Q     What is a cold bean sandwich?

21   A     They sent me some brown beans, runny, regular

22   beans, but they were straight up.

23   Q     How does that cause you problems with your health?

24   A     The weight loss that resulted.

25   Q     So you didn't eat it, because you didn't like it.

Robert W. Avery 3/8/2019                                      Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

                                                                     Page 108

1    A    Oh, I ate everything.  I may have griped about it,

2    but I ate everything, and still lost a lot of weight.

3    Q    Is this more about the fact that you were unhappy

4    with the taste, or the texture, or how it was prepared,

5    than the fact that you weren't getting actual

6    requirements for a vegetarian diet?

7    A    It has nothing to do with taste or texture.  Well,

8    being burned, has something to do with texture, does it

9    not?

10   A    Well, being a burnt smiley face was done in

11   retaliation, in response to grievances I was putting on

12   the kitchen.

13   Q    All right.  So we've talked about the lack of

14   portions, and I understand, that in addition to the

15   portion size, quantity, and then you've also talked

16   about some of the quality issues, correct?

17   A    Yes, sir.

18   Q    And you've also indicated that there were problems

19   with the fact that your diet did not contain the types

20   of foods required for vegetarian diet, right?

21   Q    Are those the things that you're complaining about?

22   A    At times, yes, sir.

23   Q    But at other times, it did comply with the

24   vegetarian diet, as far as the types of food?

25   A    Yes.  It was almost as if -- depending on what

                              Tiffanie N. Harrison, CCR
                              (501) 372-5115

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 109

1    shift was there.  Like Ms. Osborne, her shift was spot

2    on.

3    Q    All right.  So tell me what else, if anything, that

4    you have a complaint about with respect to the food you

5    were being provided, while you were in Benton County.

6    A    Covered it.

7    Q    We've covered everything?

8    A    Covered everything.

9    Q    With respect to the claims that you have against

10   Keefe, as I understand what you were indicating earlier,

11   there was the issue with the Magic Shave, which was one

12   of the issues that you had with Keefe, correct?

13   A    Uh-huh.

14   Q    And the Magic Shave, related to the fact that it

15   could potentially be used as a weapon, correct?

16   A    Yes.

17   Q    Has been used as a weapon, correct?

18   A    Yes.

19   Q    Any other problems with the Magic Shave, other than

20   that?

21   A    No.

22   Q    And then, as it relates to the other issue, that I

23   heard you complain about, was a pricing issue, correct?

24   A    Not so much the price of it -- of the Magic Shave?

25   A    No, sir.

                    Tiffanie N. Harrison, CCR
                       (501) 372-5115

Bushman Court Reporting                    Tiffanie Harrison                    501-372-5115

Page 110

1    Q    As I understand your two complaints about stuff

2    related to Keefe, was that there was an issue of how

3    much the stuff was being priced, and then there was an

4    issue that Magic Shave was being sold, because it was

5    used as a weapon, and it could be used as a weapon,

6    correct?

7    A    The other complaint, is the violation of the

8    Arkansas Deceptive Trade Practices Act.  That's the

9    other complaint.

10   Q    All right.  And does the Deceptive Trade Practices

11   Act issue relate to the pricing?  Is that what you're

12   talking about?

13   A    It relates to the fact that under the Arkansas

14   Deceptive Trade Practices Act, it makes it illegal for

15   people to knowingly take advantage of the consumer, who

16   is reasonably unable to protect his or her interest, or

17   engage in any unconscionable, or false, Trade Practices

18   Act.

19   Q    What are you reading from?

20   A    What am I reading from?

21   Q    Yes, Sir.

22   A    ACA, title 4, section 88-107.

23   Q    Okay.  So you wrote down some notes from that

24   statute?

25   A    Yes.

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 111

1   Q     And your notes are an interpretation of that

2   statute?

3   A     No.  It's not an interpretation.

4   Q     Word for word?  Are you saying it's word for word?

5   A     Yes. It's paraphrased.

6   Q     Okay.  So you took the statute, and you combined

7   that into a paraphrase, your paraphrase, of what the

8   statue said, in your notes?

9   A     In my notes.

10  Q     All right.  Fair enough.  I just want to make sure

11  I know what you're talking about.  So how is what is

12  going on with respect to items that you purchased from

13  Keefe Commissary -- how is that violating the Act?  In

14  your own words?

15  A     Mark up of over 300 percent of certain items,

16  they're charging us $4 to the place my money on the

17  kiosk, just to use my own money.  Those are the

18  beginning parts of it.  Unconscionable.  Unconscionable

19  in the eyes of society.  If society feels that it's an

20  unconscionable act of the Benton County Sheriff's

21  department, and Keefe Commissary to enter into an

22  agreement, where a 34 percent commission is given on

23  each dollar sold through the commissary...

24  Q     All right.  So just so I'm clear on what you're

25  telling me.  You mentioned a lot of things there, and I

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 112

1   want to kind of break those down a little bit, so I can

2   understand what you're saying, all right?

3        So one of the things that I thought I heard you

4   talk about was placing $4 on the kiosk.  And I want to

5   know what you mean by that.

6   A    There is a $4 flat rate to deposit money on the

7   kiosk, run by Keefe, for the use of items purchased by

8   us, in turn the commission causes a kickback on it as

9   well.

10  Q    All right.  Commission is something else, right?

11  A    (Non-verbal response.)

12  Q    But is the $4 a minimum limit that you have to

13  have, in order to purchase from --

14  A    No.  Its just the fee charged, for placing money on

15  the kiosk.  They are charging us and our families $4 to

16  put money on the kiosk, the cash.

17  Q    Tell me how that works.

18  A    Say you've got $25.  You put $25 in it.  You have

19  $21 placed on your account, and Keefe Commissary

20  collects $4 off of that kiosk.

21  Q    All right.  So would you agree that they are

22  charging you a fee to put a commissary there in Benton

23  County?

24  A    No, they're charging me a fee, to use my own money,

25  which is being spent only and exclusively with Keefe.

Tiffanie N. Harrison, CCR
(501) 372-5115

Page 113

1    Q     Well, what if we pull the commissary out of there?

2    A     Pull it out, please.  Then I won't be forced to

3    purchase soap, boxers, all of that.  Benton County was

4    running fine for years, when there was no commissary.

5    With the commissary being there, we are forced to

6    purchase things from the commissary.

7    Q     All right.  Explain what you mean by that.

8    A     Say if I refuse to buy anything from Keefe.  I am

9    still forced to purchase soap, toothpaste, toothbrush,

10   through the commissary.  There's no way around it now.

11   You have to purchase everything from there.  If you want

12   a pair of socks, the jail doesn't provide them.  You are

13   forced to buy them from Keefe.  If you want a pair of

14   boxers, you've got to buy them from Keefe.  The jail

15   used to provide all of this, and T-shirts and so forth.

16   Now, they have taken all of this, and forced us to

17   purchase that.

18   Q     The Benton County Detention center does provide you

19   with close, correct?

20   A     A shirt and a pair of pants, that's it.

21   Q     And they also provide you with some flip-flops,

22   right?

23   A     Yes.

24   Q     And so, you're completely covered, with that stuff

25   that's provided, without charge to you, correct?

Robert W. Avery 3/8/2019                                          Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 114

1    A    Right.

2    Q    Tell me about the percentage.  What's your problem

3    with that?

4    A    It just shows where the markup begins.  It's 34

5    percent, $.34 on a dollar.  That's why now when you go

6    up to purchase a $.20 Ramen noodle soup, it costs you

7    $.98 at the Benton County Jail.

8    Q    And how have you come up with those increase in

9    prices?  How did you determine that?  By the price set

10   forth in the information provided.

11   Q    So the information that you get, shows how much it

12   would cost to purchase from Keefe?

13   A    No.  I know how much -- the reference t0 20 cent

14   soups, is a reference to the purchase price that I pay

15   for it here at ABC, and Keefe is the distributor to ADC.

16   So I'm paying $.20 here -- $.28 here, excuse me.  And

17   then I go to Benton County, I'm paying $.98 for the same

18   soup I purchased.  Do you see where I'm going?

19   A    I think I understand what you're saying.  Is that

20   you have purchased at one facility, the same item, at a

21   different price than you purchased that item at Benton

22   County Detention Center?

23   A    No.  I'm just using that as a guide, as to what it

24   would be, and what it is at a different place.  You

25   know, I'm not begrudging anyone from making a profit,

Tiffanie N. Harrison, CCR
(501) 372-5115

Bushman Court Reporting                         Tiffanie Harrison                         501-372-5115

Page 115

1    but a markup of that much, given 34 percent commission,

2    violates the Arkansas Deceptive Trade Practices Act,

3    which it's going to be up to the court to argue.

4    Q    As I understand your -- I'm going to call it a

5    legal argument, but as I understand your argument, as it

6    relates to the violation of the Deceptive Trade

7    Practices Act, is that somehow this Act determines, or

8    puts a limit on how much a retailer can sell its

9    products for?

10   A    It puts no limit on it.  It says any unconscionable

11   act.  And the consciousness, which the law refers to,

12   would be the morals, of the educated involved in

13   society, which would be a matter for the court to

14   determine.

15   Q    And are you aware that the case law interpreting

16   this statute, indicates that it must be unconscionable

17   and deceptive, that both of those go together?  Are you

18   familiar with that?

19   A    It states right here, "Unconscionable Deceptive

20   Trade Practice Act, made unlawful, and prohibited by

21   this chapter, includes, but are not limited to,

22   knowingly taking advantage of a consumer, who is

23   reasonably unable to protect his or her interest", which

24   falls under that.

25   Q    You believe that you're unable to protect your

Page 116

1   interest?

2   A    In a setting like that, yes.  I had no course of

3   action.  I can write a grievance.  I can complain until

4   I'm blue in the face.  Until I take action in the

5   courts, I have no recourse.

6   Q    Do you agree with me that you are on a different

7   playing field, because you're incarcerated, than you

8   would be out in the free world?

9   A    I'm still a consumer.

10  Q    Is that a no to my question?

11  A    That's a no.

12  Q    So what about the fact that you're purchasing items

13  from Keefe is deceptive, if at all?

14  A    I won't argue with deceptive.

15  Q    You know how much it's going to cost you, correct?

16  A    Yes.

17  Q    You know about the $4 that you have to pay for,

18  correct?

19  A    Now I do, yes.

20  Q    It wasn't hidden from you, was it?

21  A    No.

22  Q    I mean it was probably made pretty clear, in order

23  to do this, you going to have to pay four bucks.

24  A    I noticed that one time I had somebody deposit

25  money, and I seen it.

Page 117

1   Q    You did cover with Ms. Davis, all of your medical

2   conditions, that you suffer from, all the chronic

3   medical conditions you suffer from?

4   A    Yes, sir.

5   Q    You have looked through I take it, all of the

6   documents that were sent to you by Benton County, and

7   Turn Key, and Trinity, and Keefe, have you not?

8   A    Yes.  Those I have done.  Like I said when I first

9   got in here, like your request for production and stuff,

10  I didn't get the first batch.  I apologize.  So there

11  may be something along the way, that I didn't get.

12  Q    With respect to all of the records that you've

13  reviewed, do any of them, but that one time in April

14  2018, indicate that you've had weight as low as 216

15  pounds?

16  A    No.

17  Q    And that was the only one, correct?

18  A    I went from 216, back up to 250.

19  Q    So that was the only one at that low of a weight,

20  correct?

21  A    Yes.

22  Q    The other ones were in the 260-250 range, correct?

23  A    No.  250 was the highest I got.  I got to ADC, and

24  I dropped back down to 240, 238-240.  When I got here,

25  that's what I weighed.  That was because I started

Page 118

1    purchasing from the commissary.

2    Q    Food from the commissary?

3    A    Yes.

4    Q    What are you eating from the food at the commissary

5    here at ADC?

6    A    Nothing.  Coffee.  They treat me well here.

7    Q    Okay.  I guess I was confused about what you said.

8    I thought you said you gained weight, once you got here,

9    because you started --

10   A    No, I'm sorry.  I gained weight at Benton County,

11   because I started purchasing from the commissary.  I

12   apologize.  Yeah, they treat me well here.

13            MR. WRAY: All right.  Mr. Avery, I

14            appreciate your time and patience with me

15            today.  They may have some other questions,

16            that were raised by some of the other things

17            that we've said, so I'll pass you over to them.

18            MS. DAVIS: I just have a little bit.

19   BY MS. DAVIS:

20   Q    Mr. Avery, do you admit lying in grievances to get

21   a different result from the staff at Benton County?

22   A    I don't recall.  Not lying.  Which one?

23   Q    Well, for instance, do you recall identifying your

24   wife as someone who wasn't your wife?

25   A    Calling Jamie my wife, yes.

Page 119

1   Q     So you lied about that?

2   A     Yeah, I called her my wife, because that's what I

3   was calling her.

4   Q     Why did you feel like you needed to call her your

5   wife?

6   A     There's no reason.  I just did.

7   Q     Is that what you called her normally?

8   A     No.

9   Q     I mean, like when you were out of jail?

10  A     No.  I was referring to her in the Seventh-day

11  Adventist, I just said it, because we were living

12  together at the time.

13  Q     So you were living with her?  Earlier in your

14  testimony, you said you weren't.

15  A     She was there.  She would come over, as soon as the

16  kids went to school.  She would leave again about 4:00

17  in the afternoon.

18  Q     Okay.  But when you identified her as your wife on

19  March 26th, she was not sure wife; is that right?

20  A     No, she wasn't.  Actually at that time, Tracy was

21  sitting there trying to call to arrange wedding

22  proceedings.

23  Q     Have you always been a Seventh-day Adventist?

24  You've never converted to anything else?

25  A     I did in Benton County jail, because Lieutenant

Page 120

1   Holt took my vegetarian tray, so I said that I was going

2   to Buddhist, because it's a philosophy of life, not

3   religion, so that I could maintain a vegan tray, a

4   vegetarian try, because I don't eat meat.

5   Q    Because originally, when you asked for a vegetarian

6   tray, it was because you said you needed it for gout; is

7   that right?

8   A    Yes, it's documented.

9   Q    And then, when it was denied, because of that, then

10  that's when you asserted your religious --

11  A    No, I asserted --

12  Q    Hold on.  Let me finish my question.  That's when

13  you asserted your religious claim about Seventh-day

14  Adventist?

15  A    No, ma'am.  I asserted my --

16  Q    Let's look at the grievance, okay.  On March 22nd,

17  you asked for a vegetarian diet.  You said, "I have

18  gout.  This is caused by meet.  I've sent a medical

19  request, and a change in religion and diet.  No change

20  has been made.  Please assist me in getting a vegetarian

21  diet, or vegan tray.  Thank you."  And that was sent to

22  medical, right?

23  A    Yes.

24  Q    In fact, you sent two other requests about that,

25  about gout, to medical, and both times they said, you

Robert W. Avery 3/8/2019                                    Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

                                                                              Page 121

1   know, "We don't honor diet changes, after you're booked

2   in"; is that right?

3   A    Right.

4   Q    And then you said -- the next message was "Change

5   my religion."  Is that fair?

6   A    That's fair.

7   Q    So that was on March the 27th.  And then after your

8   vegetarian tray was taken, because you were trading food

9   --

10  A    Yeah, the carrots and cookies.

11  Q    Hold on.  You were trading food.  Within hours, you

12  converted to Buddhism; is that fair to say?

13  A    Buddhism is not a religion.  It's a philosophy.  If

14  you read the whole thing, it states that.

15  Q    Okay.  Let's read your grievance. "I'm seeking to

16  change my religion to Buddhist."

17  A    It also goes on down there --

18  Q    Mr. Avery, stop talking over me.  You asked to

19  change her religion to Buddhism, on June the 11th; is

20  that correct?

21  A    Yes.

22  Q    But you weren't actually changing your religion.

23  You were just trying to manipulate the diet tray; is

24  that fair?

25  A    In result to the retaliation --

Robert W. Avery 3/8/2019                                   Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 122

1    Q     Is that a yes or no?

2    A     As a response to the Lieutenant retaliation.

3    Q     So you understood that if you -- you were trying to

4    manipulate the system?

5    A     If you read on further down, it says that Buddhism

6    is a philosophy.

7    Q     Mr. Avery, did you ever tell deputies that if they

8    made you a trustee that you would drop the lawsuit?

9    A     I told Captain --

10   Q     Yes or no.

11   A     -- Guyll that, because I was told that my lawsuits

12   was the reason why they wouldn't make me a trustee.

13   Lieutenant Holt said that.

14               MS. DAVIS: All right.  Nothing further.

15               (WHEREUPON, the proceedings were concluded

16          in this matter at 2:10 p.m.)

17

18

19

20

21

22

23

24

                    Tiffanie N. Harrison, CCR
                       (501) 372-5115

Bushman Court Reporting                    Tiffanie Harrison                              501-372-5115

Robert W. Avery 3/8/2019                                          Robert W. Avery, ADC # 652373 v. Turn Key Health Clinics, LLC, et al

Page 123

CERTIFICATE

STATE OF ARKANSAS        )
                         )ss
COUNTY OF PULASKI        )


        I, Tiffanie N. Harrison, CCR, Certified Stenomask
Reporter before whom the foregoing testimony was
taken, do hereby certify that the witness was duly
sworn by me; that the testimony of said witness was
taken by me and was thereafter reduced to typewritten
form under my supervision; that the deposition is a
true and correct record of the testimony given by said
witness; that I am neither counsel for, related to,
nor employed by the parties to the action in which
this deposition was taken, and further, that I am not
a relative or employee of any attorney or counsel
employed by the parties hereto, nor financially
interested in the outcome of this action.
        I FURTHER CERTIFY, that I have no contract with
the parties within this action that affects or has a
substantial tendency to affect impartiality, that
requires me to relinquish control of an original
deposition transcript or copies of the transcript
before it is certified and delivered to the custodial

attorney, or that requires me to provide any service

not made available to all parties to the action.

        WITNESS MY HAND AND SEAL this 25th day of March,

2019.



_____

TIFFANIE N. HARRISON

Arkansas State Supreme Court

Certified Court Reporter #757

Bushman Court Reporting                    Tiffanie Harrison                    501-372-5115