UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ROBERT W. AVERY                                                                    PLAINTIFF

            v.                              Case No. 5:18-cv-05075

TURN KEY HEALTH CLINICS,
LLC; SHERIFF HOLLOWAY; CAPTAIN
GUYLL; and LIEUTENANT HOLT                                          DEFENDANTS


**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Robert Avery is currently an inmate of the Arkansas Department of Correction ("ADC"), Hawkins Unit for Men. The claims asserted in this case arose while Avery was incarcerated in the Benton County Detention Center ("BCDC"). Avery proceeds *pro se* and *in forma pauperis*. Avery names as Defendants Turn Key Health Clinics, LLC ("Turn Key") which is the contract medical provider for the BCDC; Benton County Sheriff Shawn Holloway; Captain Guyll; and Lieutenant Holt.

Avery contends his constitutional rights were violated because: (1) he was denied adequate medical and dental care; (2) he was not permitted to send or receive personal mail for a three month period; (3) there was a blanket ban on all books, magazines, and newspapers coming from any source; (4) his personal property was destroyed; (5) the facility was overcrowded, lacked ventilation, and was unsanitary; (6) he was denied the right to marry; and (7) he was retaliated against because he assisted inmates in requesting special diets.

Before the Court are three motions for summary judgment. Plaintiff filed a motion for summary judgment (ECF No. 58), Defendants Sheriff Holloway, Captain Guyll, and Lieutenant Holt ("The Benton County Defendants") also filed a motion for summary judgment (ECF No. 77),

and Defendant Turn Key filed a response to Avery's motion and motion for summary judgment (ECF No. 80). Avery filed a response (ECF No. 88) to Turn Key's motion and a response (ECF No. 97) to Defendants Sheriff Holloway, Captain Guyll, and Lieutenant Holt's motion for summary judgment. For the reasons set forth below, Defendants' motions will be GRANTED and Plaintiff's motion will be DENIED.

## I. LEGAL STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists." *Nat'l. Bank of Comm. v. Dow Chem. Co.*, 165 F.3d 602, 607 (8th Cir. 1999).

The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. "They must show there is sufficient evidence to support a jury verdict in their favor." *Nat'l. Bank*, 165 F.3d at 607 (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). "A case founded on speculation or suspicion is insufficient to survive a motion for summary judgment." *Id.* (*citing Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir. 1985)).

## II. DISCUSSION

Avery was incarcerated at the BCDC from March 12, 2018, until his transfer to the ADC on August 29, 2018. (ECF No. 58-1 at 1 & ECF No. 79-8 at 25). Avery filed this lawsuit on May 8, 2018. (ECF No. 1).

## A. The Denial of Adequate Medical and Dental Care Claims

### 1. The Facts

Avery testified at his deposition that when he was arrested, he informed the intake personnel of his medical issues, which included an abscessed tooth, varicose veins, and mental health issues. (ECF No. 79-8 at 24-28). According to Avery, his tooth started hurting a "few days" prior to his arrest and he used Orajel and had a dentist appointment scheduled. *Id.* Avery was arrested and incarcerated at BCDC before his dental appointment. *Id.* Avery's last dental appointment was approximately nine months prior to his incarceration and occurred during a previous incarceration with ADC. *Id.* at 84-85.

On March 12th, a note was made on Avery's medical questionnaire that he had an "abscess mouth." (ECF No. 58-1 at 1). On March 23rd, a "Dental – Toothache Protocol" form was completed and the form stated that there was visual evidence of tooth decay, redness, swelling, pus surrounding the affected tooth, the tooth was positive to percussion, and there were signs of infection. *Id.* Avery was added to the dental call list, given a soft diet, and prescribed Amoxicillin[1] for ten days and Ibuprofen for seven days. *Id.* at 3. On March 23rd, the ADC[2] approved a dental visit for Avery for relief of pain or infection of one tooth. (ECF No. 80-3 at 11). A form was also completed stating Avery had depression, post-traumatic stress disorder (PTSD), and anxiety. (ECF No. 58-1 at 3).

---

[1] "Amoxicillin is used to treat certain infections caused by bacteria, such as pneumonia; bronchitis (infection of the airway tubes leading to the lungs); and infections of the ears, nose, throat, urinary tract, and skin." https://medlineplus.gov/druginfo/meds/a685001.html (accessed Jan. 7, 2020).

[2] Although Avery was located at the BCDC, the ADC approved medical visits and medications.

On March 23rd, Avery was informed by Nurse Prince that Turn Key had not yet hired a staff dentist but were attempting to do so within its economic guidelines. (ECF No. 58 at 3). On March 31st, Avery advised medical that the antibiotics did not cure the infection from the abscess. (ECF No. 79-3 at 10). In response, Avery was advised that Dr. Saez wanted to try a stronger antibiotic. *Id.* On April 3rd Avery was started on Augmentin[3] for ten days and Ibuprofen was continued for an additional seven days. (ECF No. 80-3 at 10 & 18).

Avery was seen again on April 16th and was prescribed Ibuprofen for another seven days, topical benzocaine (Orajel) as needed, and Keflex.[4] Avery was also added to the dental list. (ECF No. 58-1 at 33).[5] On April 19th, Avery complained to BCDC that he had been given three different types of antibiotics, it had been over a month, and he still had not seen a dentist "for a painful dental issue involving an [abscessed] tooth." (ECF No. 79-3 at 26). On April 20th, Avery stated he had been "charged for a nurse call and prescription fees for a chronic issue" that was continuing because no dentist had been hired. *Id.* at 28. On April 21st, Nurse Infante advised Avery that they were "working on getting a dentist" and that she was "sorry for the delay." (ECF No. 88 at 41). On April 25th, Avery again complained of being charged for a nurse call and noted

---

[3] Augmentin is the brand name for a combination product containing Amoxicillin and Clavulanate. "The combination of amoxicillin and clavulanic acid is used to treat certain infections caused by bacteria, including infections of the ears, lungs, sinus, skin, and urinary tract. Amoxicillin is in a class of medications called penicillin-like antibiotics. It works by stopping the growth of bacteria. Clavulanic acid is in a class of medications called beta-lactamase inhibitors. It works by preventing bacteria from destroying amoxicillin." https://medlineplus.gov/druginfo/meds/a685024.html (accessed Jan. 7, 2020).

[4] Keflex is the brand name for the drug Cephalexin. "Cephalexin is used to treat certain infections caused by bacteria such as pneumonia and other respiratory tract infections; and infections of the bone, skin, ears, genital, and urinary tract." https://medlineplus.gov/druginfo/meds/a682733.html (accessed Jan. 7, 2020).

[5] A dental-toothache protocol form was completed at this visit. A box was checked on this form to indicate there were no signs of tooth decay but there was still redness, swelling and pus around the tooth. (ECF No. 80-3 at 33).

the third round of antibiotics was only necessary "because medical has not hired a dentist who would have pulled the tooth causing the abs[c]ess to continue." *Id.* at 43. On May 6th, Avery submitted a grievance stating that "due to the failure to hire/retain a dentist [T]urn [K]ey medical has not remedied, cured, or otherwise treated my abs[c]essed tooth. I have been given 3 types of [antibiotics] and seen no doctor or dentist, my tooth is still hurting, and I still have an abs[c]ess . . . ." *Id.* at 44. Nurse Infante responded: "Noted." *Id.* On May 7th, Avery was prescribed Orajel twice a day for fourteen days. (ECF No. 80-3 at 25).

As of August 29th, 2018, when Avery was transferred to ADC, Avery had not seen a dentist or a doctor for treatment of his abscessed tooth. During this time period, Avery maintains he was in pain, unable to eat, and lost a significant amount of weight. (ECF No. 58-1 at 2 & 4).[6] Avery testified that ADC pulled his tooth about one week after he arrived, after ADC sent him to a location where the tooth could be extracted. (ECF No. 79-8 at 39).

Avery testified that he needed either a root canal or the tooth removed. (ECF No. 79-8 at 40). Avery maintains he was denied adequate dental care during his entire incarceration at the BCDC—from March 12th, 2018 until August 29th, 2018. *Id.* at 39. In failing to ensure adequate dental care was provided to inmates, Avery maintains Sheriff Holloway violated his own written policy and the Constitution. *Id.* at 41. Avery has no evidence that Sheriff Holloway was aware of Avery's need for dental care. *Id.* Avery asserts only an official capacity claim against Sheriff Holloway and Captain Guyll based on the alleged denial of dental care. *Id.* at 43.

---

[6] Avery's weight was 263 lbs. on March 12th (ECF No. 58-1 at 1-2); 270 lbs. on March 23rd (*Id.* at 4); 263.2 lbs. on April 11th (ECF No 80-3 at 26); 216 lbs. on April 16th (*Id.* at 33) (the document shows Avery's weight as 216 points, however this is likely a typo and the correct weight is 261 because five days prior Avery weighed 263.2 lbs.); 251 on June 11th (*Id.* at 68); and 251 on June 21st (ECF No. 79-4 at 15).

Avery also stated that he had "[v]aricose veins, blood pooling in my legs." (ECF No. 79-8 at 16). He indicated he was first diagnosed with this condition in 2012. *Id.* His treatment at the ADC consists of wearing compression stockings, bed rest, and limited work duty, with restrictions from any prolonged standing, walking, stooping, or crawling. *Id.* at 16 & 86. The only other treatment option is surgery, which according to Avery the ADC will not pay for. *Id.* at 89. Avery had never received treatment for varicose veins except during his incarceration. *Id.* at 86. At the ADC, he wears TED[7] hose daily and he has an extra blanket at night to prop his legs up. *Id.* at 88.

With respect to his varicose veins, Avery argues he was not provided with compression stockings or bed rest which would have limited the pooling of blood into his legs and alleviated the pain associated with varicose veins. On March 22nd, Avery complained that he had varicose veins and he was not given "bed rest, etc.," to relieve his pain. (ECF No. 79-3 at 3). The following day, Avery complained that being forced to stand or sit at a table did not remedy the "pressure or pain" associated with varicose veins. *Id.* at 6.

Avery testified that on March 23rd, Nurse Shawna Stephens told him that command staff did not allow bed rest or the use of compression stockings. (ECF No. 79-8 at 33-34). The explanation given for the prohibition against compression stockings was that the stockings could be used as a weapon. *Id.* at 34.

---

[7] TED stands for thrombo-embolic-deterrent. https://www.drugs.com/cg/ted-hose.html (accessed Jan. 7, 2020). TED hose are used to prevent blood clots. *Id.* Compression stockings in general are designed to "gently squeeze your legs in a way that helps promote blood flow from the legs back toward the heart." Stronger compression stockings require a prescription which will include the strength of compression and the length of the stocking necessary to treat the diagnosed condition.
https://newsnetwork.mayoclinic.org/discussion/mayo-clinic-q-and-a-tips-for-using-compression-stockings/ (accessed Jan. 7, 2020).

Avery testified that on March 26th, Avery indicated he had been told by medical staff that they did not have the authority to give him permission to return to his cell during lock-out periods. (ECF No. 79-3 at 7). In response, Lieutenant Holt stated that medical staff had advised her that Avery did not need bed rest because he had been on antibiotics for three days.[8] *Id.* On April 1st, Avery complained that he was locked outside of his cell from 5 a.m. to 2 p.m. and because a "newspaper and deck of cards does not provide enough activity to occupy [his] time/mind he had to constantly walk." *Id.* at 10. Avery next complained about the pain from his varicose veins on April 11th. *Id.* at 18. He noted that the forced standing caused pain "due to the refusal to allow . . . compression socks . . . [ and if he] could return to [his] cell periodically the issues would lessen and gradually subside." *Id.* On April 22nd, Avery again complained about pain and swelling as a result of his varicose veins and medical staff's refusal to give him "medically documented supplies." *Id.* at 29.

On April 26th, a note was made that Avery had been approved for TED hose and was given a pair by Nurse Hawkins. (ECF No. 80-3 at 35). Avery testified that his TED hose were "were little bitty." (ECF No. 79-8 at 34 & ECF No. 80-3 at 34-35). Nurse Hawkins indicated that they could not order any others. *Id.* Avery was able to use the hose for about a month before they shrunk and Avery stated he never received a second pair. (ECF No. 79-8 at 35). Avery was authorized an additional blanket "to prop [his] leg up on, so that the pooling of the blood would dissipate." (ECF No. 79-8 at 35). On one occasion, he was authorized for two days of bed rest. *Id.*

---

[8] The antibiotics were for the treatment of the dental abscess, not varicose veins.

With respect to Sheriff Holloway and Captain Guyll, Avery testified that neither one talked to inmates. (ECF No. 79-8 at 30-31). According to Avery, there was a custom prohibiting bed rest and he believed this custom was created by BCDC staff such as Sergeant Brady. *Id.* at 35. Avery testified that Sergeant Brady informed him that they did not "give bed rest." *Id.* at 36. Avery was informed by a nurse that bed rest was limited to situations where the condition was life-threatening or severe. *Id.* Various pod deputies allegedly told Avery that unless he was dying, he would not be given bed rest. *Id.* at 37. Avery stated he had no "evidence" that command staff had to approve bed rest but, he argued that any policy, custom, practice, or procedure of the BCDC had to be signed off on, or approved by, the Sheriff. *Id.* at 38.

## 2. The Denial of Adequate Medical and/or Dental Care Claims Against Turn Key

Avery has asserted two claims against Defendant Turn Key and has moved for summary judgment. First, he contends Turn Key exhibited deliberate indifference to his serious medical needs when it failed to either provide its own dentist or send Avery to an outside dentist. Second, he contends Turn Key exhibited deliberate indifference to his serious medical needs when he was denied compression stockings or bed rest to treat his varicose veins.[9] Based on these actions, Avery contends he is entitled to summary judgment against Turn Key.

Turn Key denies it violated Avery's constitutional rights. Moreover, Turn Key argues it is entitled to summary judgment in its favor because Avery has no proof that he suffered from a serious medical need that was ignored as a result of a policy, custom, or official action of Turn Key. In the absence of such proof, Turn Key argues it cannot be held liable.

---

[9] Avery does not argue that Defendants were deliberately indifferent to his mental health care needs. Instead, he merely contends his mental conditions were aggravated by the pain he was under. (ECF No. 79-3 at 3).

**(a). Dental Care**

Turn Key is entitled to summary judgment on Avery's denial-of-dental-care claims.  Turn Key's contract provides that it "shall be the sole supplier and/or coordinator of the health care delivery system" at the BCDC.  (ECF No. 80-1 at 2, § 1.1).  With respect to dental care, the contract provides that Turn Key

> shall provide basic oral care of inmates by on-site medical personnel.  [Turn Key] shall arrange and bear the cost of emergency off-site dental services only if its medical director determines that such care is medically necessary, and under the care of a licensed dentist. Dental care will be considered off-site medical.  Costs for such services shall be the responsibility of the [BCDC], not [Turn Key].

*Id.* at 3, § 1.7.

Turn Key is required to maintain and submit statistics "to the Facility Administrator on a monthly basis, as requested."  (ECF No. 80-1 at 4, § 1.14).  With respect to grievances, the contract provides:

> Grievances shall be monitored to detect areas of concern.  Inmate grievances shall be documented according to [BCDC] policy, and [Turn Key] personnel shall prepare a response.  All information in regard to grievances shall be made available to the Facility Administrator at his request.

*Id.* at § 1.15.

Although the contract does not require Turn Key to provide on-site dental care, Turn Key indicates it started searching for a dental provider for BCDC inmates when Turn Key began work at the BCDC on March 1st, eleven days before Avery's incarceration.  (ECF No. 80-2 at 2).  By August of 2018, Turn Key located a dental provider to provide on-site dental care, and the first dental visit occurred on August 22, 2018.  *Id.*  Rhett Burnett, Turn Key's risk manager, further stated that "Turn Key Health does not have any policy, custom or official action related to the use of third party dental providers, other than its contractual duty to locate such care and provide it to

9

inmates in the event the provider deems such treatment to be necessary in his or her medical opinion." *Id.* Burnett does not address the specifics of Avery's claim, whether any BCDC inmates were referred to outside dentists or if Turn Key's "medical director" made a determination as to Avery's condition, or why Avery was not seen on August 22nd. Instead, Turn Key argues there is no objective medical record indicating that Avery's tooth condition worsened during his incarceration at the BCDC.

The Eighth Amendment's prohibition against cruel and unusual punishment establishes the government's obligation to provide medical care for those whom it is punishing by incarceration. *Estelle v. Gamble*, 429 U.S. 97, 103 (1976) (internal quotation marks and citation omitted). An inmate must rely on prison authorities to treat his medical needs and if the prison authorities fail to do so, those needs will not be met. *Id.* "For this reason, the Eighth Amendment proscribes deliberate indifference to the serious medical needs of prisoners."[10] *Robinson v. Hager*, 292 F.3d 560, 563 (8th Cir. 2002) (*citing Estelle*, 429 U.S. at 104).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. The deliberate indifference standard includes "both an objective and a subjective component: '[Avery] must demonstrate (1) that [he] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000) (*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "The prisoner must show more than negligence, more than even gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional

---

[10] The Eighth Circuit applies the deliberate indifference standard to both pretrial detainees and convicted inmates. *Jackson v. Buckman*, 756 F.3d 1060, 1065 (8th Cir. 2014).

violation." *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir.) (quoting *Estate of Rosenberg v. Crandell*, 56 F.3d 25, 37 (8th Cir. 1995)). Where the record reflects response to and treatment of a prisoner's medical condition, then to prove deliberate indifference the prisoner must show that the treatments provided were so ineffective that they were criminally reckless. *Allard v. Baldwin*, 779 F.3d 768, 772-73 (8th Cir. 2015).

In the case of dental care, it has been said that "'[d]ental care is one of the most important medical needs of inmates.'" *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (*quoting Ramos v. Lamm*, 639 F.2d 559, 576 (10th Cir. 1980)). The Eighth Circuit has recognized that "[t]oothaches can be excruciatingly painful, and dental care is an important part of proper health care." *Hartsfield v. Colburn*, 491 F.3d 394, 397 (8th Cir. 2007).

Here, it is clear that Avery suffered from a serious dental need. The record shows his tooth was decaying, infected and swollen and Avery was prescribed three separate courses of antibiotics, Ibuprofen, and Orajel. He was put on the list to see a dentist when first examined and told several other times that he was on the list. He was updated on Turn Key's progress in hiring a dentist. He was transferred out of BCDC custody one week after Turn Key's newly-hired dentist began to make site visits, and his tooth was extracted in ADC custody. A delay in the provision of dental care can constitute deliberate indifference. *See, e.g., Patterson v. Pearson*, 19 F.3d 439, 440 (8th Cir. 1994) (one-month delay treating infection that required extraction could constitute deliberate indifference); *Boyd v. Knox*, 47 F.3d 966, 969 (8th Cir. 1995) (ruling three-week delay in sending referral for dental care after observing swollen and infected tooth was unreasonable and raised triable fact questions); *Cf., Johnson v. Leonard*, 929 F.3d 569, 577 (8th Cir. 2019) (finding dentist did not ignore complaints of pain or exhibit deliberate indifference when he saw inmate every time

he was put on the dental list, treated him ten times over seventeen months, and performed dental exams, cleanings, x-rays, a tooth extraction, temporary fillings, and permanent fillings). Here, there was no delay in treatment, but rather in the treatment that Avery preferred.

In this case, the facts establish that Avery had a readily ascertainable need for dental care when he was booked in on March 12th and Avery was almost immediately placed on a "dental list" by medical staff. The facts also establish that Turn Key had not hired a dentist to provide on-site dental care and was not able to until August 2018. Avery's condition, though serious, was not emergent, so no referral to an off-site dentist was made. Avery was told by medical staff on several occasions that Turn Key was working on hiring a dentist and that was the cause of the delay in his receipt of dental care. In the interim, Turn Key used antibiotics to treat Avery's infection. The evidence does not support an inference of gross negligence, let along an inference of criminal recklessness. There is no genuine dispute of material fact with respect to whether any Turn Key personnel were deliberately indifferent to Avery's medical needs, and summary judgment for Turn Key is proper on Avery's denial-of-dental-care claims.

### (b). Medical Care for Varicose Veins

Assuming without deciding that varicose veins constitute a serious medical need, summary judgment is proper for Turn Key. Avery testified that he endured pain and swelling as a result of the condition. Further, Avery was treated for his varicose veins at the ADC with a combination of compression stockings, bed rest, and physical restrictions. Avery was given an additional blanket to elevate his legs and for a period of time was provided compression hose. Avery does not suggest that Turn Key had any unconstitutional policy or custom. Instead, his argument is that the BCDC had policies which precluded bed rest except in extreme circumstances and prohibited the use of

compression stockings since they could possibly be used as weapons. The BCDC's alleged policies or customs cannot form a basis of liability on Turn Key's part. Turn Key is, therefore, entitled to summary judgment on Avery's claim regarding varicose veins.

### 3. The Denial of Adequate Medical and/or Dental Care Claims Against the Benton County Defendants

#### (a). Personal Capacity Claims Against Sheriff Holloway and Captain Guyll

Avery concedes he had no contact with Sheriff Holloway and Captain Guyll in connection with his medical and/or dental claims. He therefore is no longer pursuing personal capacity claims against them. (ECF No. 79-8 at 43). Sheriff Holloway and Captain Guyll are therefore entitled to summary judgment on the personal capacity claims against them.

#### (b). Personal Capacity Claims Against Lieutenant Holt

Lieutenant Holt denies that she was deliberately indifferent to Avery's serious medical or dental needs. For purposes of the summary judgment motion, Lieutenant Holt concedes Avery had serious dental and medical needs. *Id.* However, Lieutenant Holt contends there is no evidence she was personally involved in making any decisions regarding Avery's dental or medical treatment. Further, Lieutenant Holt argues there is no evidence of any detrimental effect of the alleged delay or denial of compression stockings, bed rest, or dental treatment.

"Liability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights. To establish personal liability of a supervisory defendant, [plaintiff] must allege specific facts of personal involvement in, or direct responsibility for, a deprivation of his constitutional rights." *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007) (internal quotations and citation omitted).

In *Langford v. Norris*, 614 F.3d 445 (8th Cir. 2001), the Eighth Circuit noted that it has long been the law that "the mere contracting of services with an independent contractor does not immunize [a governmental official] from liability for damages in failing to provide a prisoner with the opportunity for such treatment." *Langford*, 614 F.3d at 460. "In this sense the defendants have a nondelegable duty to provide medical care when needed." *Crooks v. Nix*, 872 F.2d 800, 804 (8th Cir. 1989).

Lieutenant Holt reviewed all grievances including those regarding medical care. She either responded to the grievances or reassigned them to medical. She was the person at the BCDC who had direct knowledge of Avery's claim that he was not being provided necessary medical care.

For instance, on March 26th, Avery submitted a grievance regarding the pain from his abscessed tooth. (ECF No. 79-3 at 7). Lieutenant Holt responded that she did not have "the authority to assess or [provide] input on medical concerns." *Id.* On April 11th, Avery submitted a grievance complaining about the pain he suffered as a result of his varicose veins and the fact that he had been denied compression stockings. *Id.* at 18. Lieutenant Holt replied that the medical staff made all medical decisions. *Id.* On April 19th, Avery complained he had been put on three different antibiotics for his abscessed tooth but had not seen a dentist for the painful condition. *Id.* at 26. Lieutenant Holt forwarded this grievance to medical. *Id.* On April 21st, Avery again complained that he was still suffering from an abscessed tooth and had been told the reason was that Turn Key had not hired a dentist. *Id.* at 28. Lieutenant Holt again forwarded this grievance to medical. *Id.*

Lieutenant Holt was the BCDC administrator who would be aware of gaps in Avery's treatment. Lieutenant Holt had a constitutional duty to ensure prisoners who needed medical care

received it, and if Lieutenant Holt knew needs were not being treated and remained indifferent she may be personally liable. *See Langford*, 614 F.3d at 460-461. However, the evidence is clear that Turn Key was providing medical treatment to Avery for his tooth, even if it was not the treatment Avery preferred. Because Avery's needs were being adequately treated by the medical staff to whom Lieutenant Holt referred Avery's complaints, Lieutenant Holt cannot be found to have been deliberately indifferent to Avery's medical needs with respect to his denial of dental care. Furthermore, because the Court finds below that Avery cannot show that BCDC's customs or policies affecting bed rest and denial of compression socks serve no legitimate penological purpose, Lieutenant Holt cannot be liable for following those policies.

### (c). Official Capacity Claims Against Benton County

Because Benton County contracted with Turn Key to provide dental care, and Turn Key adequately did so, Avery cannot show that BCDC had a custom or policy of deliberate indifference to serious medical needs. Furthermore, Avery's testimony is that the medical staff informed him that BCDC had a policy limiting bed rest and prohibiting compression socks or custom of limiting bed rest and prohibiting the use of compression socks. (ECF No. 79-8 at 33). Avery has not shown a genuine dispute of fact with respect to whether this alleged policy serves a legitimate penological purpose. Because Avery has not made this showing, he cannot show that the custom or policy results in unnecessary and wanton infliction of pain and suffering to rise to the level of an Eight Amendment violation. *See Jordan v. Farrier*, 788 F.2d 1347. 1348 (8th Cir. 1986). BCDC is entitled to summary judgment on Avery's denial of medical care claims.

**B. Interference with Mail Claims**

**1. The Facts**

Avery testified that Lieutenant Holt refused to allow him access to his personal mail and that beginning on April 5th or 6th, he was locked out of the system entirely. (ECF No. 79-8 at 43). He could not send or receive any personal mail until August 3, 208, however, he could receive legal mail. *Id.* at 43-44. Avery's communication privileges, telephone, and email were prohibited by the state court judge because Avery violated a no-contact order through the use of email and phone.

Avery maintains that he was left with "no alternative means of communication with the outside world." (ECF No. 79-8 at 46). According to Avery, the judge only prohibited him from having access to email and the telephone and argues it was Lieutenant Holt who extended the prohibition to postal mail. *Id.* at 46-47. During the period of time that he was denied personal mail, Avery's grandmother died and his girlfriend suffered a miscarriage and Avery testified that he did not learn about either event until his transfer to the ADC. (ECF No. 79-8 at 46).

**2. Personal Capacity Claims Against Sheriff Holloway, Captain Guyll, and Lieutenant Holt**

Avery testified he was no longer pursuing personal capacity claims against Sheriff Holloway and Captain Guyll. (ECF No. 79-8 at 47). He is, however, pursuing a personal capacity claim against Lieutenant Holt. *Id.*

Lieutenant Holt argues that the state court judge placed the restriction on Avery's communication privileges including e-mail, telephone, and personal mail because Avery violated of a no-contact order. Lieutenant Holt contends that the restriction on Avery's mail was due to his

admitted violation of a court order and Avery's constitutional rights were not violated because the restriction was reasonably related to legitimate penological interests, *i.e.,* security of the facility and the criminal justice process, enforcement of the courts' orders, and protection of witnesses and alleged victims.

In his response, Avery concedes he was in violation of the no contact order because of his e-mail and phone use. He is not pursuing claims as to the restriction on these means of communication. Instead, Avery is pursuing his claim that Lieutenant Holt unconstitutionally suspended his First Amendment right to send and receive personal mail.

Inmates have a First Amendment right of free speech to send and receive mail. *Hudson v. Palmer*, 468 U.S. 517, 547 (1984). "The fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment." *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 125 (1977). Restrictions on this First Amendment right are valid "only if [they are] reasonably related to legitimate penological interests." *Turner v. Safely*, 482 U.S. 78, 89 (1987). Specifically, the Eighth Circuit Court of Appeals held "prison officials may lawfully censor prison mail that is detrimental to the security, good order and discipline of the institution," however, this mail policy "must advance a legitimate penological interest." *Kaden v. Slykhuis,* 651 F.3d 966, 968 (8th Cir. 2011) (internal quotation marks and citation omitted).

The Court takes judicial notice of the entries in Avery's state court criminal cases then proceedings in Benton County, Arkansas, *State v. Robert Avery*, 04CR-18-494 (Filed March 15, 2018), and *State v. Robert Avery*, 04CR-18-487 (filed March 14, 2018). On May 15, 2018, Avery filed a letter in that case addressed to the presiding judge. The letter reads: "I was before you on

4/30/18 at which time you suspended my E-Mail and Phone privileges. [Lieutenant] Holt here at the jail has suspended my U.S. Postal Mail. This was not one of the items at issue and was not addressed by you. Would you please correct this issue?" After a review of the state dockets, the Court does not find the initial no contact order to which this letter refers. Subsequently, however, on May 24, 2018, the presiding judge entered an order clarifying "ALL communication privileges with exception of attorney are suspended." (emphasis in original). The only reasonable inference to be drawn is that Lieutenant Holt was obeying the state court's no-contact orders. Security of the criminal justice process, enforcement of a court's orders, protection of victims and witnesses are legitimate penological interests, and Lieutenant Holt's decision to obey the state court's order did not violate Avery's First Amended rights. Summary judgment for Lieutenant Holt is proper.

### 3. Official Capacity Claims Against Benton County

The record contains no evidence that the restriction on Avery's mail was due to a policy or custom of Benton County, except to the extent Benton County has a policy of following court orders. Avery has testified he is no longer asserting an official capacity claim, and Defendants are entitled to summary judgment on the official capacity claim. (ECF No. 79-8 at 47).

### C. Ban on Books, Magazines, and Newspapers

### 1. The Facts

The BCDC "found that contraband could be smuggled into the facility in books delivered by individuals by dropping illegal substances onto the paper of the books or by concealing items in the spine of the books." (ECF No. 79-1 at 4). According to Megan Rutledge, administrative assistant to the captain over the detention center and custodian of records, due to this security risk,

the BCDC "ceased accepting books that were directed to inmates from individuals." (ECF No. 79-1 at 3).

The BCDC policy on incoming property does make an exception for donated books dropped off by individuals. (ECF No. 79-6 at 22). The incoming property policy issued on March 1, 2018, provides that books may be accepted; however, the "jail staff will inform the party dropping a book off that the book is dropped off on a donation basis. When the inmate leaves the facility, the book will remain in the possession of the BCDC." *Id.* There are certain exclusions as to the types of books accepted. *Id.*

BCDC provides "reasonable library services" to "eligible inmates" so long as the services are "consistent with reasonable and necessary security and safety standards, operational controls, and supervision of inmates." (ECF No. 79-1 at 4). Library services provide fiction, non-fiction, law, and educational books. (ECF No. 79-6 at 57). The library policy states that: "Friends or family members MAY NOT bring books to inmates. The facility will accept donations of books from approved agencies, groups, companies, etc. The Jail Captain will be the ultimate approving official for donated books." *Id.* The BCDC also has a policy of not accepting packages for any inmates. (ECF No. 79-1 at 3). However, the BCDC does allow inmates to correspond with their "attorney, family, friends, officials, and other significant contacts with minimum interference." (ECF No. 79-1 at 3).

The BCDC policy against packages is designed to deter and detect the introduction, fabrication, possession, and conveyance of contraband. (ECF No. 79-1 at 3 & ECF No. 79-6 at 14). Contraband "is any item that was not issued to the inmate or not given to the inmate by jail staff in accordance with facility policy." (ECF No. 79-1 at 3). Even items belonging in the facility

may constitute contraband if the item does "not belong in the possession or vicinity of an inmate." *Id.* The BCDC uses frequent search techniques to deter inmates from violating facility security and safety policies. *Id.* at 2.

Avery contends the policies together amount to a blanket ban prohibiting inmates from receiving books, magazines, or newspapers from any outside source in violation of the First Amendment. (ECF No. 79-8 at 61). Avery indicates he is pursuing his First Amendment claim only to the extent the ban prohibits inmates from receiving books, magazines, and newspapers from publishers, retailers, or other similarly trustworthy sources. (ECF No. 97 at 14).

Avery concedes that newspapers are put in the pod every day and that the BCDC has a limited number of books available for inmates. (ECF No. 79-8 at 61). However, Avery argues asserts most of the books are "torn up, wor[n] out, and they won't replace them." *Id.* at 61-62. He concedes the U.S. News and People magazines are made available. *Id.* at 62. Inmates also have access to a law library on the kiosk when the kiosk is working. *Id.* at 64. Avery nevertheless maintains the BCDC "fails to provide adequate books, newspapers, or magazines." *Id.* at 62. Avery testified that he tried to buy the Prisoners Self-Help Litigation Manual from Prison Legal News sometime in April. (ECF No. 79-8 at 63). Third-parties also tried to purchase Avery various titles from Amazon Books but Avery was denied permission to purchase the books. *Id.* at 64.

## 2. Personal Capacity Claims Against Sheriff Holloway, Captain Guyll, and Lieutenant Holt

Avery's states a claim for violation of his First Amendment rights because of the alleged ban on books, magazines, and newspapers against the "BCDC Command Staff of Sheriff Holloway[,] Jail Commander Guyll, John and Jane Doe(s) . . . ." (ECF No. 1 at 13). Although

Avery listed multiple people in this claim, Avery testified that the only personal capacity claim he is asserting is against Sheriff Holloway because Sheriff Holloway is the final policymaker and adopted the book policy.  (ECF No. 79-8 at 67).

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law.  Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'  As long as the government entity receives notice and an opportunity respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).  A government entity is liable only when the entity itself is the moving force behind the alleged constitutional violation.  *Id.*

Despite Avery's testimony that he is asserting a personal capacity claim against Sheriff Holloway, Avery's claim is that the policy, and adoption of the policy, was unconstitutional.  (ECF No. 79-8, p. 67).  Because this claim is about the book policy, and not the individual actions taken by defendants, Avery's claim is an official capacity claim.

### 3.  Official Capacity Claims Against Benton County

Prisoners do not "forfeit all their constitutional protections by reason of their conviction and confinement in prison."  *Bell v. Wolfish*, 441 U.S. 520, 544  (1979)(citations omitted).  "[A] prison inmate retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of our corrections system."  *Pell v. Procunier*, 417 U.S. 817, 822 (1972).  This includes a First Amendment right to "receive information and ideas."  *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972).  To determine if a regulation or restriction is reasonable, the court looks at four factors:  (1) whether a rational

connection exists between the regulation and a neutral, legitimate government interest; (2) whether alternative means exist for inmates to exercise the constitutional right at issue; (3) what impact the accommodation of the right would have on inmates, prison personnel, and allocation of prison resources; and (4) whether obvious, easy alternatives exist. *Turner*, 482 U.S. at 89-91.

The Court finds, based on the *Turner* factors, that the BCDC book policy is reasonable. The policy is not a complete ban that limits inmates from obtaining every book, it instead provides that books will be accepted by the jail clerk's office, but only on a "donation basis." (ECF No. 79-6 at 22). This means that books can be brought by outside individuals to the jail, but that the books will be available to all the inmates through the library. The policy does limit the types of books that will be accepted, for example books of a violent nature or books containing sexual content will be accepted. BCDC's penological interest in this book policy is "to maintain property with the upmost level of integrity . . . property accepted by the BCDC will not jeopardize the safety and security of the facility." *Id.* BCDC's interest in preventing prisoners from receiving books direct is expressly connected to the need to protect the safety and security of the facility. Further, the BCDC policy on contraband states that the BCDC aggressively controls contraband in order to "maintain a safe, secure, and healthy environment for employees, detention deputies, and inmates." *Id.* at 19. Because contraband can be smuggled into BCDC through books directed to specific inmates, BCDC stopped accepting books that were delivered directly to inmates. There is a rational connection between the policy of only accepting books on a donation basis and BCDC's legitimate interest in preventing contraband and ensuring the security of the facility.

Alternative means exist for inmates to read books because the policy still allows for books to be donated and an inmate can have someone donate a book to BCDC that the inmate can then

get from the BCDC's library. If BCDC allowed an accommodation and all books could be given to prisoners directly from outside sources, jail staff would likely have to spend considerable amounts of time screening for contraband. BCDC previously had issues with individuals dropping off books for specific inmates and concealing contraband in the spine of the books or dropping illegal substances on the paper of books. (ECF No. 79-1 at 4). The impact this type of accommodation would have on BCDC and prison resources would be significant. Although an alternative may exist in having all books screened, this is not an easy alternative that could be facilitated without significant burden to BCDC and screening would not be completely effective at preventing contraband from coming into the facility. Because BCDC has stated a reasonable penological interest in preventing contraband and the policy is reasonable, the Court finds the defendants are entitled to summary judgment.

### D. Destruction of Personal Property

### 1. The Facts

Avery brings a claim asserting an unidentified deputy destroyed his Bible that had been signed and given to him by Chaplain Don. (ECF No. 79-8 at 65). The spine of the Bible was allegedly removed and a bookmark was ripped out. Avery testified he had brought the Bible with him from the Washington County Detention Center. *Id.* According to Avery, Lieutenant Holt knew who had destroyed the Bible because she addressed the matter after Avery filed a grievance. *Id.*

### 2. Personal Capacity Claims Against Sheriff Holloway, Captain Guyll, and Lieutenant Holt

The Benton County Defendants argue that none of them are alleged to have been personally involved in the destruction of the Bible. Even if Defendants had taken and destroyed the Bible, Defendants contend there was no constitutional violation because Avery has an adequate state law remedy. The Court agrees. Even an intentional deprivation of property does not violate due process when a meaningful post-deprivation remedy is available. *Hudson v. Palmer*, 468 U.S. 517, 534 (1984). Due process is satisfied by an adequate post-deprivation remedy. *Id.; see Elliot v. Hurst*, 817 S.W.2d 877, 880 (1991) (finding cause of action for conversion lies where distinct act of dominion is exerted over property in denial of owner's right). The partial destruction of the Bible was a random act for which the county would not be in a position to provide a pre-deprivation remedy. Defendants are entitled to summary judgment on this claim.

### 3. Official Capacity Claims Against Benton County

Avery makes no allegation that Benton County has a custom or policy of destroying Bibles or books in the possession of inmates and no official capacity claim is asserted. Therefore, Defendants are entitled to summary judgment on this claim.

### E. Conditions of Confinement—Overcrowding, Ventilation, and Sanitation

### 1. The Facts

Avery testified that the BCDC "has a custom of placing three detainees in a two-man cell, which is . . . about 60 square feet." (ECF No. 79-8 at 67). According to Avery, he was housed in a two-man cell with two other inmates during the months of March, April, and May. *Id.* Other than two nights when he slept on the floor, Avery had a bunk every night. *Id.* at 68.

Avery testified inmates were locked in the cell from 8:00 pm to 5:00 am and from around 1:00 pm to 5:00 pm. (ECF No. 79-8 at 68 & 74). The lights are turned off at 10:00 pm and Avery

testified he usually slept from midnight to 5:00 am.  *Id.* at 69.  From 1:00 pm to 5:00 pm, it is a forced lock-down with the lights turned off which the deputies referred to as "nap time."  *Id.*  Avery testified that during the lock-down periods inmates were required to be in their bunks because "[you] couldn't move."  *Id.*  Avery stated the only way you could get to the restroom was "if the man on the floor got up and moved his rack."  *Id.* at 69-70.  Avery testified that he believes each person is entitled to 60 square feet and, therefore, three inmates should have a total of 180 square feet.  *Id.*

Avery also stated the ventilation was insufficient to keep up "with the body heat of three individuals."  (ECF No. 79-8 at 70).  During the period Avery was at BCDC, the walls would sweat and mold was on the walls and under the bunks.  *Id.*  Twice during a six-month period bleach was brought in to combat the mold, and inmates were also given cleaning supplies each morning.  *Id.* at 70-71.  When the inmates were locked out of their cells, two cells were left open for restroom purposes and there were two showers.  (ECF No. 79-8 at 73).  This resulted in forty-eight people using the two restrooms and showers that were only cleaned once a day.  *Id.*  Avery alleges this was unsanitary.  *Id.*

Avery testified the overcrowding combined with the close proximity of people and the volume level aggravated his anxiety, depression, and PTSD.  (ECF No. 79-8 at 71).  His Abilify became insufficient in helping him cope and Avery was put on Depakote too.  *Id.*  Avery also maintains the noise was excessive when the inmates were locked out of their cells and were in the day-room.  *Id.* at 73.  Avery testified that because there was no room to sit down in the day-room, he was forced to continuously walk circles, which allowed blood to pool in [his] legs."  (ECF No.

79-8 at 74). Avery indicated this was nine hours a day and each day he experienced blood pooling in his legs. *Id.*

## 2. Personal Capacity Claims Against Sheriff Holloway, Captain Guyll, and Lieutenant Holt

Avery testified he is not pursuing personal capacity claims against Defendants with respect to his conditions of confinement claim. (ECF No. 79-8 at 75). Defendants are entitled to summary judgment on these claims.

## 3. Official Capacity Claims Against Benton County

Avery maintains the BCDC had a custom of assigning too many inmates to a cell and keeping inmates in cells that lacked sufficient ventilation and were unsanitary. Further Avery states BCDC imposed "nap" time. Avery maintains these conditions resulted in excessive noisiness, exposure to diseases, and increased violence.

The Benton County Defendants maintain there is no evidence that Avery was deprived of a human need. The Benton County Defendants note the cells had enough room for a third inmate to sleep on the floor. Further, Avery had never had a confrontation with any cell mates and except for two nights, Avery slept in a bed every night. Although inmates were on lock down from 1:00 p.m. to 5:00 p.m. and 8:00 p.m. and 5:00 a.m., the remainder of the day inmates had access to an open day room area where they could shower, exercise, and communicate through the facility kiosk system. Finally, Benton County Defendants argue Avery's personal view of the possible risks due to overcrowding does not establish a constitutional violation.

"The Eighth Amendment standard for conditions of confinement is whether the defendants acted with deliberate indifference." *Davis v. Oregon Cty., Mo.,* 607 F.3d 543, 548 (8th Cir. 2010).

26

The deliberate indifference standard requires proof of both an objective and subjective element. *See Revels v. Vincenz*, 382 F.3d 870, 875 (8th Cir. 2004) (*citing Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendant's conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner." *Revels*, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." *Revels,* 382 F.3d at 875.

Jail or prison officials must provide reasonably adequate ventilation, sanitation, bedding, hygienic materials, food, and utilities. *Irving v. Dormire,* 519 F.3d 441 (8th Cir. 2008). It is well settled that "overcrowding alone is insufficient to create a due process violation." *A.J. by L.B. v. Kierst*, 56 F.3d 849, 854 (8th Cir. 1995). For a violation to exist, the overcrowding must have "led to deprivations of essential food, medical care, or sanitation" or have led to an increase in inmate violence. *Patchette v. Nix*, 952 F.2d 158, 163 (8th Cir. 1991) (citation omitted). In evaluating overcrowding claims, the courts look to a number of factors, including the size of the living space, the length of time spent in the cell each day, the length of confinement, and the opportunity for exercise. *Kierst*, 56 F.3d at 855. The Eighth Circuit has found when inmates are out of their cells for eight hours a day or more, up to six inmates "may be housed in the 130-154-square-foot cells." *Campbell v. Cauthron,* 623 F.2d 503 (8th Cir. 1980).

Here, while Avery estimated the cell was only 60 square feet in size, he testified it had two bunks, a toilet, and sufficient floor space for another inmate to sleep on a mat on the floor. Avery

had a bunk to sleep in every night but two.  The inmates spent approximately 13 hours each day locked-down in their cells and 11 hours each day in the day-room.  The day-room had tables and chairs, enough room to walk around in, access to restrooms, and showers, and access to an inmate kiosk where inmates could place requests and grievances and access a legal library.  According to Avery, he was in a two-man cell for approximately three months.

Avery had daily access to cleaning materials, hygiene materials, and showers.  He makes no argument that he was denied clothing or bedding and in fact indicates he was provided an extra blanket at night to elevate his legs.  He received three meals a day, although not of the quality or quantity that he desired.  Despite Avery's statements that the ventilation in the cell was inadequate to deal with the combined body heat of three inmates, Avery makes no argument that he suffered from heat exhaustion or a similar condition caused or exacerbated by the poor ventiliation.  Avery has failed to show the existence of a genuine issue of material fact as to whether he was denied the minimal civilized measure of life's necessities.  Defendants are entitled to summary judgment on the official capacity claim.

**F.  Right to Marry**

**1.  The Facts**

During his time at BCDC, Avery was engaged to Trac.y who was pregnant at the time. (ECF No. 79-8 at 75-76).  Tracy called BCDC to arrange their marriage but was told "there was a policy stating that unless a marriage license was obtained prior to . . .  incarceration, that [Avery] would be denied the right to marry."  *Id.* at 75.   When Avery submitted a grievance, Lieutenant Holt responded noting that the clerk's office requires both parties to be present to obtain a marriage

license and it was a security issue to transport an inmate to the clerk's office.  *Id.* at 76-77.  Avery maintains this policy denied him the fundamental right to marry.  *Id.*

**2.  Personal Capacity Claims Against Sheriff Holloway, Captain Guyll, and Lieutenant Holt**

Avery has asserted no personal capacity claims.  (ECF No. 79-8 at 78).  Defendants are therefore entitled to summary judgment on these claims.

**3.  Official Capacity Claims**

The BCDC has a policy that expressly allows inmates to marry if they have a valid marriage license dated prior to their incarceration.  Policy No. 12.11 sets forth the marriage policy:

Marriages may be held on the date and time approved by the Jail Captain or designee. Special arrangements may be made by the shift supervisor if circumstances call for a change in date, time, or area.  While incarcerated at the BCDC, an inmate who wishes to marry must comply with the following procedures:

1.  Inmates will submit a written request to the Jail Captain to marry;

2.  A marriage license must be completed and obtained by the parties requested to marry, and must be dated PRIOR to the incarceration.

 a.  Inmates will not be transported to apply for, sign, or obtain a marriage license while incarcerated at the BCDC.

3.  A Justice of the Peace and/or clergy will be furnished by the parties requesting to marry.

4.  The two persons to be married, the one Justice of the Peace and/or clergy, and a member of jail staff will be the only persons allowed in attendance;

5.  **NO PHYSICAL CONTACT OF ANY KIND WILL BE ALLOWED BETWEEN THE PERSONS BEING MARRIED;**

6.  The ceremony will take place with the inmate located in the glass visitation area inside the facility.  The person to whom the inmate is marrying and the Justice of the Peace and/or clergy will be in the other visitation area.  The subjects will conduct all conversations over the visitation telephones.

(ECF No. 79-6 at 54) (emphasis in original).

Avery argues application of this policy resulted in him being denied the right to marry and in his being treated differently than prisoners who had a license. He concedes he did not have a license to marry.

It has long been held that there is a fundamental right to marry protected by the Due Process Clause of the Constitution. *See Loving v. Virginia*, 388 U.S. 1, 12 (1967). The right applies to prisoners. *Turner*, 482 U.S. at 96-99. In *Turner*, one of the issues before the Court was whether a regulation prohibiting prisoners from marrying unless approved by the prison superintendent was unconstitutional. *Id.* at 96. The Court found the regulation unconstitutional and noted that "[m]any important attributes of marriage, remain, however, after taking into account the limitations imposed by prison life. . . . These incidents of marriage, like the religious and personal aspects of the marriage commitment, are unaffected by the fact of confinement or the pursuit of legitimate corrections goals." *Id.* at 96-97. The Court held the fundamental right to marry was only subject to restrictions that were based on legitimate penological interests. *Id.* at 96-99.

In this case, the BCDC policy in question limits the right to marry to those inmates who have, prior to their incarceration, obtained a marriage license. According to Defendants, this policy is based on the fact that Arkansas law requires applicants to be physically present to obtain a marriage license. Thus, to obtain a license an inmate would have to be transported to the county clerk's office. Defendants also point out that there are additional security issues "when an inmate is transported to a location where civilians are placed at risk of harm, additional resources are required because of the affirmative duty to protect those placed in harm's way that is required of transporting officers." (ECF No. 79-1 at 9).

This policy meant Avery could not marry while he was an inmate at the BCDC because he did get a marriage license prior to his incarceration.  As noted above, the BCDC will not transport inmates for the purpose of obtaining a marriage license due to security concerns including the risk to the public.  Because Arkansas law[11] requires individuals to obtain a marriage license from the county clerk and both persons must be present, a BCDC inmate cannot receive a marriage license.

Applying the reasonable relationship test from *Turner* to the policy prohibiting inmate transportation outside the facility for purposes of obtaining a marriage license, the Court concludes Defendants have advanced legitimate penological concerns, primarily their security concerns with transporting inmate's outside the prison and into a public place, that are both reasonable and compelling.  Defendants permit marriages to occur within the facility.  It is the policy of the county clerk that requires the personal presence of marriage applicants.  *See e.g., Jones v. Perry*, 215 F. Supp. 3d 563, 565 (E.D. Ky. 2016) (explaining because Kentucky statutes make no mention of the in-person requirement imposed by the county clerk, the in-person requirement was unconstitutional); *Amos v. Higgins*, 996 F. Supp. 2d 810 (W.D. Mo. 2014) (finding Missouri statute requiring marriage license applicant to sign in the presence of the recorder enjoined as applied to fiancées of prisoners who were unable to appear due to incarceration).  The Court concludes there are no genuine issues of material fact as to whether the BCDC's policy violates Avery's fundamental right to marry.

To the extent Avery is asserting an Equal Protection claim, the claim fails.  The Fourteenth Amendment provides in relevant part that no state shall "deny any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  The Equal Protection Clause generally

---

[11] Ark. Code Ann. § 9-11-201, *et. seq.*

requires similarly situated inmates to be treated alike. *Bogren v. Minnesota*, 263 F.3d 399, 408 (8th Cir. 2000). Avery has not shown that he was similarly situated to inmates who obtained marriage licenses prior to their incarceration. Absent some evidence that Avery was similarly situated to those receiving more favorable treatment, no Equal Protection Claim is stated. *Klinger v. Dep't of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994). Defendants are entitled to summary judgment on this claim.

### G.  Retaliation

### 1.  The Facts

Avery also alleges Lieutenant Holt retaliated against him for assisting other inmates in requesting special diets and/or in the filing of grievances. (ECF No. 79-8 at 54-56). Avery testified that Lieutenant Holt warned him to "quit teaching" the other inmates about receiving diet trays and when he did not stop, she retaliated by removing him his vegetarian diet. *Id.* 54-57. The alleged retaliation occurred two days after Lieutenant Holt admonished Avery for showing other inmates how to get diet trays. *Id.* Lieutenant Holt's stated reason for changing Avery's tray was because Avery had been trading food items in violation of the agreement Avery signed to receive a vegetarian tray. (ECF No. 79-3 at 60-64). Avery conceded that he was trading food but stated he only traded the food because he was receiving hard foods despite his soft food diet and needed to trade his hard food for soft food. *Id.* at 60.

### 2.  Personal Capacity Claims Against Lieutenant Holt

Lieutenant Holt argues there is no evidence of retaliation on her part and she cannot be held liable solely because she was a supervisor. Additionally, Lieutenant Holt argues there is no

nexus between her asking Avery to quit teaching other inmates to request special diet trays and her taking Avery off the vegetarian diet.

In *L.L. Nelson Entrs., Inc. v. City of St. Louis, Mo.*, 673 F.3d 799, 807-08 (8th Cir. 2012) the court stated that:

> [t]o establish a § 1983 claim for retaliation in violation of the First Amendment, a plaintiff must allege (1) that [he] engaged in a protected activity, (2) that the defendants responded with adverse action that would chill a person of ordinary firmness from continuing the activity, and (3) that the adverse action was motivated at least in part by the exercise of the protected activity.

*Id.* (internal quotation marks and citations omitted). "In brief, the plaintiff must show the official took the adverse action because the plaintiff engaged in protected speech." *Revels v. Vincenz*, 382 F.3d 870, 876 (8th Cir. 2004).

The record shows Lieutenant Holt changed Avery's tray because he was trading his "special diet food away" with other inmates. (ECF No. 79-3 at 61). There were at least nine instances of Avery trading food and because he signed a form stating that he would not trade his food, Avery was removed from the vegetarian diet. Avery has provided no other evidence, aside from the proximity of Lieutenant Holt's request and Avery's removal from the vegetarian diet, that there was a nexus between Lieutenant Holt telling him to stop assisting other inmates in getting special diet trays and Avery being taken off his soft vegetarian diet. Because the record reflects Lieutenant Holt removed Avery from the vegetarian diet for trading food, and not for his assistance to other inmates, the Court finds Lieutenant Holt is entitled to summary judgment on Avery's retaliation claim. Avery makes no argument that Sheriff Holloway or Captain Guyll were involved in any way, or even aware of, the alleged retaliatory action. Defendants are entitled to summary judgment on the retaliation claim.

### 3. Official Capacity Claim Against Benton County

Avery has not alleged any facts suggesting Benton County had a policy or custom of retaliating against inmates who assisted other inmates in filing requests or grievances. No official capacity claim is stated.

## III.  CONCLUSION

IT IS THEREFORE ORDERED that Defendant Turn Key's motion for summary judgment (ECF No. 80) and Benton County Defendants' motion for summary judgment (ECF No. 77) are GRANTED. Avery's motion for summary judgment (ECF No. 58) is DENIED. Plaintiff's claims are DISMISSED WITH PREJUDICE. Judgment will be entered separately.

IT IS SO ORDERED this 12th day of February, 2020.

/s/ P.K. Holmes, III
P.K. HOLMES, III
U.S. DISTRICT JUDGE